ORIGINAL
FILED

MAY 1 6 2007

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

1  Royal F. Oakes (080480), roakes@barwol.com
2  Michael A. S. Newman (205299), mnewman@barwol.com
   BARGER & WOLEN LLP
3  633 West Fifth Street, 47th Floor
   Los Angeles, California 90071
   Telephone: (213) 680-2800
4  Facsimile: (213) 614-7399

E-filing

6  Attorneys for Defendant
7  METROPOLITAN LIFE INSURANCE COMPANY

EMC

8              UNITED STATES DISTRICT COURT

9            NORTHERN DISTRICT OF CALIFORNIA

10                   C 07      2597

11  EDWARD CONTRERAS,                )  CASE NO.
                                     )
12              Plaintiff,           )  NOTICE OF REMOVAL
                                     )  PURSUANT TO 28 U.S.C. §§ 1441
13       vs.                         )  AND 1446
                                     )
14  METROPOLITAN LIFE INSURANCE      )  [Filed concurrently with:
    COMPANY, THE COMMISSIONER        )  -  Certificate of Interested Parties;
15  OF THE CALIFORNIA                )  -  Corporate Disclosure Statement;
    DEPARTMENT OF INSURANCE and      )  -  Civil Cover Sheet; and
16  DOES 1 - 50, inclusive,          )  -  Certificate of Service]
                                     )
17              Defendants.          )
                                     )
18                                   )
                                     )
19                                   )  Complaint Filed: April 10, 2007

FAXED
_____

BARGER & WOLEN LLP
633 W. FIFTH ST.
FORTY-SEVENTH FLOOR
LOS ANGELES, CA 90071
(213) 680-2800

i:\office7\7197\184\07pleadings\removal notice_fed.doc

TO THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA:

PLEASE TAKE NOTICE that Defendant Metropolitan Life Insurance Company ("MetLife") hereby seeks removal of Case Number CGC-07-462224 from the Superior Court of the State of California for the County of San Francisco, to this Court, pursuant to 28 U.S.C. Sections 1441 and 1446. This Notice of Removal is being filed without prejudice to the objections and defenses of the removing defendant, MetLife. Removal of this action is proper for the following reasons:

## I.  TIMELINESS OF REMOVAL

1. MetLife was first served with process in this action on April 17, 2007, when MetLife was served with a copy of the summons and complaint.

2. This removal is timely under 28 U.S.C. § 1446(b) in that removal is sought within 30 days after service of the summons and complaint.

## II.  DIVERSITY OF CITIZENSHIP

3. The action is a civil action of which this Court has jurisdiction under the provisions of 28 U.S.C. § 1332, and is one which may be removed to this Court by MetLife pursuant to the provisions of 28 U.S.C. § 1441(b), in that it is a civil action between citizens of different states and the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs, as set forth more fully below.

4. Plaintiff Edward Contreras' ("Contreras") Complaint alleges that he was Chief of Police, Department of Developmental Services in the State of California at

all relevant times, and that he is a resident of the State of California. *Complaint*, ¶¶ 1,
6, 8. (Newman Decl., ¶ 2, Exh. "A.") Based thereon, MetLife is informed and
believes that he is a citizen of the State of California.

5. MetLife is a corporation organized and existing under the laws of the
State of New York, having its principal place of business therein. (Newman Decl., ¶
3, Exh. "B".) At all times pertinent, the citizenship status of MetLife as a citizen of
the State of New York has remained the same. (Newman Decl., ¶ 3, Exh. "B".)
Accordingly, at the time of the filing of the complaint and the filing of this Notice of
Removal, MetLife was and is a citizen of the State of New York. (Newman Decl., ¶
3, Exh. "B".) The "principal place of business" is determined through application of
a two-part test. The first prong identifies the principal place of business as the state
where a "substantial predominance" of corporate activity takes place, and where the
corporation's activities are not predominant in a single state, then the principal place
of business is where the majority of its executive and administrative functions are
performed. *United Computer Systems, Inc. v. AT&T Corp.,* 298 F.3d 756, 763 (9th
Cir. 2002). Under either prong of this test, MetLife's principal place of business is
in New York. (Newman Decl., ¶ 3, Exh. "B".) Furthermore, MetLife's citizenship is
attested to in numerous district court opinions. *Vega-Muniz v. Metro. Life Ins. Co.,*
278 F. Supp. 2d 146, 147 (D.P.R. 2003) ("Metlife is a corporation organized and
existing under the laws of the State of New York with its principal place of business
in New York."); *Morgan v. Metro. Life Ins. Co.,* 2003 U.S. Dist. LEXIS 6540, *2
(E.D. La. 2003) ("MetLife is a New York Corporation having its principal place of
business in New York."); *Stensrud v. Metlife Investors Ins. Co.,* 29 Employee
Benefits Cas. (BNA) 1190, *5 (N.D. Ill. 2002) ("MetLife is a New York corporation
with its principal place of business in New York.").

6.  The Commissioner of the California Department of Insurance ("Commissioner"), as an administrative agency exercising power delegated by the State, has no citizenship for jurisdictional purposes. *Morongo Band of Mission Indians v. California State Bd. of Equalization*, 858 F.2d 1376, 1381-82 (9th Cir. 1998) (see Footnote 1).  MetLife alleges Commissioner is a "sham" defendant fraudulently joined in this action whose presence in this action should be disregarded for removal purposes. *See Farias v. Bexar County Brd. of Trustees*, 925 F.2d 866, 871 (5th Cir. 1991).

## III. <u>AMOUNT IN CONTROVERSY</u>

7.  The amount in controversy exceeds the jurisdictional minimum of this Court in that Contreras seeks judgment against MetLife for, among other things, past and future disability insurance benefits under MetLife's Term Disability Plan Policy No. 08324-G (the "Policy"), and the disputed benefits total well over $75,000.00. The disability income insurance policy under which Contreras made his claim for benefits provides for monthly disability benefits of $1,054.90. *Complaint*, ¶7, Exhibit "A," specifically, the "Schedule of Benefits." Contreras alleges that MetLife wrongfully terminated his disability claim and that he is entitled to disability benefits after December 2005. *Complaint*, ¶¶8-16. Had he continued to received benefits, he would have been entitled to $1,054.90 per month beginning December 2005, *Complaint*, ¶ 7, and continuing until he was 65 (in the year 2014). Therefore, alleged benefits add up to approximately $100,000. Contreras further seeks general damages, including mental distress punitive damages, attorneys' fees, and special damages (*Complaint*, pages 14-15 (Prayer for Relief)), which, combined with the compensatory damages alleged, well exceed the jurisdictional minimum of this Court. *See Brandt v. Superior Court*, 37 Cal. 3d 813, 817 (1985); *Richmond v. Allstate Ins. Co.*, 897 F. Supp. 447, 450 (S.D. Cal. 1995) (emotional distress damages may be used

in calculating the jurisdictional amount for purposes of removal); *Conrad v. Hartford Accident & Indem. Co.,* 994 F. Supp. 1196, 1198 (N.D. Cal. 1998) (finding that special and general damages, attorneys' fees, and punitive damages are included in the calculation of the amount in controversy).

8.  Finally, under applicable Ninth Circuit authority, Defendants are not required to prove in absolute terms that more than $75,000 is at issue. Rather, a "defendant must provide evidence establishing that it is 'more likely than not' that the amount in controversy exceeds" $75,000.00. *Sanchez v. Monumental Life Ins. Co.,* 102 F.3d 398, 403 (9th Cir. 1996). Because Plaintiff seeks compensatory damages in excess of $75,000, punitive damages, emotional distress damages, and attorneys fees, it is "more likely than not" that the amount in controversy exceeds $75,000.

## IV.  <u>THE COMMISSIONER OF INSURANCE IS A SHAM DEFENDANT</u>

9.  The only named defendant other than MetLife is the Commissioner, who is a fraudulently joined sham defendant. "Fraudulent joinder is a term of art. If the plaintiff fails to state a cause of action against a resident defendant, and the failure is obvious according to the settled rules of the state, the joinder of the resident defendant is fraudulent." Moore's Federal Practice (1986) para. O.161[2]. "The defendant seeking removal to the federal court is entitled to present the facts showing the joinder to be fraudulent." *Ritchey v. Upjohn Drug Co.,* 139 F.3d 1313, 1318 (9th Cir. 1998). Courts have found fraudulent joinder where a cause of action could not be stated against the California defendant. *Kruso v. International Tel. & Tel. Corp.,* 872 F.2d 1416, 1426-27 (9th Cir. 1989) (joinder fraudulent where no cause of action could be stated); *Gasnik v. State Farm Ins. Co.,* 825 F. Supp. 245, 247 (E.D. Cal. 1992) (*accord*). Furthermore, a fraudulently joined defendant need not join in the

petition for removal. *Emrich v. Touche Ross & Co.*, 846 F.2d 1190, 1193 (9th Cir. 1988). It is therefore clear that he is a sham defendant. His naming in this lawsuit should not defeat diversity jurisdiction.

10. It is clear that Contreras has joined the Commissioner only for the sake of defeating the removal. Contreras has alleged a claim against MetLife for breach of contract (first cause of action) with respect to a policy of disability insurance issued by MetLife to the State of California to cover participants such as Contreras. In addition to the breach of contract claim, Contreras has alleged related tort claims against MetLife for breach of the covenant of good faith and fair dealing (second cause of action), intentional misrepresentation (third cause of action) and intentional infliction of emotional distress (fourth cause of action). The Commissioner is not named as a defendant in any of the causes of action against MetLife.

11. In addition to the causes of action against MetLife, Contreras has alleged two separate causes of action against the Commissioner. There are no causes of action that are common to both MetLife and the Commissioner.

12. Contreras' causes of action against the Commissioner, although vague and broad in scope, generally address the alleged failure of the Commissioner to comply with the laws and regulations, and/or the Commissioner's allegedly wrongful approval of the Policy or policy forms.

13. The Commissioner is a "sham" defendant because there is no possibility that Contreras can prove a cause of action against the Commissioner. Further, he has "no real intention to get a joint judgment" against the Commissioner. *See AIDS Counseling & Testing Ctrs. v. Group W Television, Inc.*, 903 F.2d 1000, 1003 (4th Cir. 1990); *McCabe v. General Foods Corp.*, 811 F.2d 1336, 1339 (9th Cir. 1987).

1  Contreras' causes of action against the Commissioner are without merit given the

2  facts of this case.

3

4  **A. <u>Contreras' Fifth And Sixth Causes Are Barred By The Statute of</u>**

5  **<u>Limitations</u>**

6

7        14. In his fifth cause of action Contreras claims that he has a statutory right

8  to action by the Commissioner under Insurance Code section 12940. *Complaint*, ¶63.

9  California Code of Civil Procedure section 338(a) provides that an action based upon

10  a right created by statute must be brought within three years. Section 338 applies to

11  actions for mandamus. *Raymond v. Christian*, 24 Cal. App. 2d 92, 113 (1937);

12  *Borsuk v. Massachusetts Mutual Insurance Company*, 2003 U.S. Dist. Lexis 25259,

13  *25 (N.D. Calif. September 4, 2003). *Monroe v. Trustees of California State*

14  *Colleges*, 6 Cal. 3d 399, 405 (1971) ("Well established precedent decrees, of course,

15  that the statute of limitations in a mandamus proceeding 'begins to run when the

16  [petitioner's] right first accrues. [Citations.]'"). The right to petition accrues once

17  there is "(1) [a] clear, present and usually ministerial duty upon the part of the

18  respondent [citations]; and (2) a clear, present and beneficial right in the petitioner to

19  the performance of that duty [citations]." *Moran v. Department of Motor Vehicles*,

20  139 Cal. App. 4th 688, 691 (2006). Thus, the statute of limitations for a writ of

21  mandate begins to run when the insured agrees to the terms of his policy, *i.e.*, when

22  he purchases the policy that allegedly fails to conform to the requirements of the

23  Insurance Code.

24

25        15. *Borsuk*, *supra*, is directly on point and involves claims against the DOI

26  identical to Contreras' claims herein.[1] There, the plaintiff filed a claim against his

27  _____

28  [1] In fact, Borsuk was represented by the same counsel who is Contreras' counsel of record in this
action.

disability insurer, Massachusetts Mutual, and the Commissioner in state court.
Exactly as in this case, Borsuk alleged that the Commissioner wrongfully approved
his disability insurance policy. The insurance company removed the case to federal
court on the ground that the Commissioner was a sham defendant named solely to
defeat diversity. In denying plaintiff's motion to remand, the court in *Borsuk* found
that *plaintiff failed to state a cause of action against the Commissioner for a writ of
mandate because the applicable three-year statute of limitations had expired.* In so
finding, the court held that the statute began to run at the time that plaintiff agreed to
the terms of his policy, in that case in 1992, which was the date he purchased the
policy. *Borsuk, supra* at *25 ("Borsuk was on notice of the second issued policy no
later than 1992, the date he agreed to the terms of that policy. This action was
commenced ten years after that date and (presumably) more than ten years after the
policy form at issue was approved."). Here, Contreras alleges that the Commissioner
approved the instant Policy sometime before 1995 when the coverage was issued.
*Complaint*, ¶¶6, 55. The statute of limitations on Contreras' claims against the
Commissioner, therefore, expired in 1998 – nearly a decade before Contreras filed
this lawsuit on April 10, 2007. The sixth cause of action, a declaratory relief cause of
action that follows fifth cause of action, is similarly barred. *Howard Jarvis
Taxpayers Ass'n v. City of La Habra*, 25 Cal. 4th 809, 821 (2001) (where mandamus
cause of action is barred by the statute of limitations, related declaratory relief cause
of action is also barred).

**B. Contreras Cannot Obtain The Relief He Seeks Against The
Commissioner Because He Has Failed To Exhaust His
Administrative Remedies**

BARGER & WOLEN LLP
633 W. FIFTH ST.
FORTY-SEVENTH FLOOR
LOS ANGELES, CA 90071
(213) 680-2800

16. With respect to his claims against the Commissioner, Contreras has administrative remedies available to him that he has failed to pursue and, therefore, he cannot be permitted to seek relief in this Court against the Commissioner.

17. Where an administrative remedy is provided by statute, relief must first be sought from the administrative agency and the remedies exhausted before the courts will review the actions of that agency. Courts will not interfere until the administrative process has run its course. *See Temescal Water Co., v. Dept. Public Works*, 44 Cal. 2d 90, 106 (1955); *Wolfe, supra*, 46 Cal. App. 4th at n.5. The purpose of that requirement is to afford the agency an opportunity to exercise its discretion before being subjected to interference by the courts. *Associated Calif. Loggers, Inc. v. Kinder*, 79 Cal. App. 3d 34, 43 (1978).

18. There is an administrative process that can be followed in this regard. Specifically, the California Insurance Code gives the Commissioner several administrative means to administer the Unfair Claims Settlement Practices Act ("UCPA") found in Insurance Code section 790.03(h). The principal means are:

- The claims complaint and resolution process (Ins. Code §§ 12921.3 and 12921.4)
- Market conduct examinations (Ins. Code § 790.04)
- Cease and desist proceedings (Ins. Code §§ 790.05 and 790.06)
- License suspension and revocation (Ins. Code §§ 701, 704 and 728)

19. With respect to the claims complaint and resolution process referenced above, the Claims Services Bureau of the Consumer Services Division of the California Department of Insurance ("CDI") is authorized to receive, evaluate, and mediate complaints about claims settlement practices. *See* Ins. Code § 12921.1 *et*

*seq.* However, the CDI is not empowered to adjudicate claims; it can only mediate them. *See* Ins. Code §§ 12921.3, 12921.4. The Commissioner has adopted detailed procedures for receipt, investigation and resolution of complaints against insurers. These include establishing a toll free number for complaints, maintaining CDI's records on complaints for three years and reporting CDI's efforts in the annual report to the Governor.

20. Contreras has not alleged any attempt to use the administrative remedies available under the Insurance Code, nor has he alleged an adverse result from any such efforts. MetLife is informed and believes, as reflected by Contreras' failure to include any such allegations, that he has failed to exhaust his administrative remedies.

## C. **Contreras Is Not Entitled To The Writ Of Mandate He Seeks**

21. With his fifth cause of action for a writ of mandate, Contreras asserts numerous and varied duties on the part of the Commissioner. He asserts that the Commissioner failed to fulfill those duties, and Contreras seeks an order from the Court requiring the Commissioner to perform the duties. More specifically, Contreras contends that the Commissioner failed in unspecified ways to require compliance with Insurance Code sections 790.03(h) and 10291.5, the Fair Claims Settlement Practices Regulations and "various DOI rulings and bulletins." *Complaint*, ¶68.

22. However, in order to obtain the writ or order he seeks, Contreras must satisfy the standards set forth in California Code of Civil Procedure §§ 1085, *et seq.*, which provides as follows: "A writ of mandate may be issued by any court, except a municipal court, to any inferior tribunal, corporation, board, or person, to compel the performance of an act which the law specifically enjoins, as a duty resulting from an

1  office, trust, or station, or to compel the admission of a party to the use and

2  enjoyment of a right or office to which the party is entitled, and from which the party

3  is unlawfully precluded by such inferior tribunal, corporation, board, or person."

4

5        23. Preliminarily, Contreras cannot obtain writ relief because he is not

6  seeking "to compel the performance of an act which the law specifically enjoins."

7  Rather, Contreras is seeking to compel the Commissioner to comply with general

8  obligations.

9

10        24. Additionally, there are traditional prerequisites to writ relief that

11  Contreras has not satisfied. Before he may obtain the relief he seeks, Contreras must

12  demonstrate that he does not have an adequate remedy at law. *See* Calif. Code Civ.

13  Proc. § 1086 ("The writ must be issued in all cases where there is not a plain, speedy,

14  and adequate remedy, in the ordinary course of law . . . ."); *see also Omaha Indem.*

15  *Co. v. Superior Court (Greinke),* 209 Cal. App. 3d 1266, 1274-75 (1989). Here, there

16  unquestionably is an adequate remedy. As discussed above, Contreras may submit a

17  complaint with the Commissioner and request administrative action by the

18  Commissioner and, as he has already done, he may commence a legal action against

19  MetLife for his claimed damages.

20

21        25. Contreras must also show that he will suffer irreparable injury if the writ

22  relief is not granted. *See Omaha Indem. Co., supra*, 209 Cal. App. 3d at 1274-75. He

23  cannot meet this standard because he has an adequate remedy at law; he can pursue

24  his administrative remedies; and he can, as he is doing, pursue this action against

25  MetLife.

26

27        26. Contreras is also not entitled to the writ relief he seeks because he is

28  improperly attempting to control the administrative discretion conferred upon the

1    Commissioner. A writ of mandate **may not be used to control such discretion**; a

2    writ may be issued only when there is a clear, present and usually ministerial duty on

3    the part of the respondent and a clear, present and beneficial right in the petitioner to

4    the performance of that duty. *See Venice Town Council, Inc. v. City of Los Angeles*,

5    47 Cal. App. 4th 1547, 1558 (1996); *Helena F. v. West Contra Costa Unified School*

6    *Dist.*, 49 Cal. App. 4th 1793, 1799 (1996).

7

8              **D.   The Relief Sought In Contreras' Fifth Cause Of Action Is An**

9                     **Improper Attempt To Circumvent *Moradi Shalal***

10

11             27. Because Contreras' fifth cause of action appears to address the

12    Commissioner's lack of action concerning Contreras' claim based on his alleged

13    failure to enforce the UCPA, this is an improper attempt to circumvent the California

14    Supreme Court's decision in *Moradi Shalal v. Fireman's Fund Ins. Cos.*, 46 Cal. 3d

15    287, 304 (1988) (holding that no private right of action exists under the UCPA); *see*

16    *also Rattan v. United Services Auto. Ass'n,* 84 Cal. App. 4th 715, 724 (2000).

17

18             **E.   Contreras Sued the Commissioner for the Improper Purpose of**

19                    **Defeating Diversity**

20

21             28. Contreras named the Commissioner as a defendant in this action for the

22    sole and improper purpose of defeating federal court diversity jurisdiction, so that he

23    can forum shop. This strategy is revealed by the fact that Contreras' counsel, Ray

24    Bourhis and/or his firm, has filed numerous disability insurance cases against various

25    insurers wherein the Commissioner has also been named as a defendant. Some, but

26    not all, of those cases are as follows: *Brazina v. Paul Revere Life Ins. Co.*, Case No.

27    CV-03-00290, filed January 22, 2003; *Guyton v. Unum Life Ins. Co. of America*, Case

28    No. CV-03-00291, filed January 22, 2003; *Iverson v. Provident Life and Accident Ins.*

*Co.*, Case No. CV-03-00292, filed January 22, 2003; *Perry v. Centre Life Ins. Co.*, Case No. CV-03-00615, filed February 12, 2003; *Borsuk v. Massachusetts Mutual Life Ins. Co.*, Case No. CV-03-00603, filed February 13, 2003; *Stone v. New England Fin.;* Case No. CGC-03-418714, filed March 27, 2003; *Kempe v. MetLife Ins. Co. of America*, Case No. CV-03-03816, filed August 15, 2003; *Baldwin v. UnumProvident Corp.*, Case No. CGC-03-425908, filed October 30, 2003; *Allen v. High Mark Life Ins. Co.*, Case No. CGC-04-427995, filed January 14, 2004; *Gross v. UnumProvident Corp.*, Case No. CGC-04-429111, filed February 26, 2004; *Acar v. UnumProvident Corp.*, Case No.: CGC-05-437894, filed January 19, 2005; *Fink v. UnumProvident Corp.*, Case No. 05-CV-02875, filed July 14, 2005; *Tomback v. UnumProvident Corp.*, Case No. 05-CV-03157, filed August 4, 2005; *Hangarter v. The Paul Revere Life Ins. Co.*, Case No. 05-CV-04558, filed November 8, 2005; *Houk v. Guardian Life Ins. Co. of America*, Case No. CGC-06-449255, filed February 6, 2006; *Robillard v. Liberty Mutual*, Case No. CGC-06-449572, filed March 14, 2006; *West v. UnumProvident Corp.*, Case No. CGC0-06-452091, filed May 9, 2006; *Surles v. MetLife Ins. Co. of America*, Case No. C 06 5807 JL, filed August 24, 2006; *Saccaro v. The Paul Revere Life Ins. Co.*, Case No. CGC-06-455765, filed August 31, 2006; *Maiolino v. UnumProvident Corp.*, Case No. C 04-0407-SI, filed March 20, 2007; *Mahjouri v. Provident Life and Accident Ins. Co.*, Case No. CGC-07-461992, filed April 4, 2007; and *Squiers v. UnumProvident Corp.*, Case No. CGC-07-462326, filed April 12, 2007. MetLife is informed and believes that these complaints contain almost the identical allegations against the Commissioner as those contained in Contreras' Complaint.[2]

---

[2] Notably, the presence of the Commissioner does not defeat diversity jurisdiction. When a state official is sued in his or her official capacity, the suit is considered a suit against the state itself, and a state is not "a citizen of a State." *Moor v. County of Alameda*, 411 U.S. 693, 717 (1973). Further, "[a] claim alleged against a state officer acting in his official capacity is treated as a claim against the state itself." *Morongo Band of Mission Indians v. Calif. State Bd. of Equalization*, 858 F.2d 1376, 1382 n.5 (9th Cir. 1988) (citing *Kentucky v. Graham*, 473 U.S. 159, 166 (1985)) ("An official-capacity suit is, in all respects other than name, to be treated as a suit against the entity . . . . We, therefore, disregard the citizenship of the individual [state officers] in assessing jurisdiction

29. For the foregoing reasons, MetLife alleges that the Commissioner is a sham defendant who was fraudulently joined in this action.

30. A true and correct copy of the Summons and Complaint and all other documents served on MetLife in this action is attached hereto as Exhibit "A." Written notice of the filing of this Notice of Removal has been given to all adverse parties and a copy has been filed with the Clerk of the Superior Court of the State of California, City and County of San Francisco, in accordance with the provisions of 28 U.S.C. § 1446(d).

F. **Because Contreras' Claims Against The Commissioner Involve Complex Regulatory And Business Issues In An Industry That Is Highly Regulated, The Claims Should Be Dismissed**

31. With his fifth cause of action against the commissioner for a writ of mandate, Contreras seeks unnecessary judicial intervention into an area governed by a regulatory agency, the DOI. Moreover, what Contreras seeks with his fifth causes of action would require this Court to monitor and supervise not only the business of insurance conducted by MetLife, but also to monitor and supervise the DOI in its oversight of MetLife. The business of insurance is very comprehensive and complex as is the regulation of the insurance industry, and the judicial arena is not suited to what Contreras seeks. The DOI, however, is well suited to take on the issues that Contreras has presented. The DOI has administrative procedures available to address all of Contreras' concerns. What Contreras is seeking is an order requiring the DOI

---

under section 1335."); *Northeast Federal Credit Union v. Neves*, 837 F.2d 531, 534 (1st Cir. 1988) (defendant state tax assessor, sued under section 1335 in his official capacity, "has no citizenship for jurisdictional purposes"). Under the above-referenced authority, the Commissioner is not a citizen of California and in fact he "has no citizenship for jurisdictional purposes."

to comply with numerous, vaguely described statutory duties imposed on it by the Legislature. The purported basis for this relief is the DOI's alleged failure to comply with its duties. The following excerpt from Contreras' Complaint demonstrates the extraordinary scope of what Contreras is asking.

> On information and belief, Plaintiff alleges that the COMMISSIONER and DOI have filed to perform the duties imposed upon the COMMISSIONER to require compliance with the California Insurance Code, including but not limited to §§ 790.03(h) and 1029.5, as well as the Fair Claims Settlement Practices Regulations (10 Cal. Admin. [sic] Code §2695.1 *et seq*) and various DOI rulings and bulletins dealing with the same or similar subject matter. The acts and omissions of the DOI has contributed to defendants' ability to perpetuate the unlawful, fraudulent and or other wrong acts alleged herein.

*Complaint*, ¶68. If this Court actually undertook such a task, it would have to oversee almost every aspect of MetLife's business, as well as the Commissioner's oversight role.

32. The DOI, however, has procedures in place to address all of the matters of which Contreras complains. This Court should not be forced by Contreras to needlessly do the Commissioner's work when the Commissioner is more than capable.

33. Accordingly, the claims against the Commissioner should be dismissed under the authority of *Wolfe v. State Farm Fire & Casualty Ins. Co.*, 46 Cal. App. 4th

554, 562-68 (1996) and *Korens v. R.W. Zukin Corp.,* 212 Cal. App. 3d 1054, 1059 (1989).

34. Furthermore, dismissing the claims against the Commissioner and permitting the Commissioner to address Contreras' allegations directly does not prejudice Contreras in any way.  If entitled, he can obtain through the DOI's administrative procedures the administrative remedies that he seeks, and he can pursue all of his legal remedies against MetLife.

WHEREFORE, MetLife prays that the above action pending in the Superior Court of California for the County of San Francisco be removed to this Court.

Dated: May 16, 2007                    BARGER & WOLEN LLP


By: _____
ROYAL F. OAKES
MICHAEL A. S. NEWMAN
Attorneys for Defendant
The Metropolitan Life Insurance
Company

## DECLARATION OF MICHAEL A. S. NEWMAN

I, Michael A. S. Newman, declare as follows:

1.     I am an attorney licensed to practice in this Court and all the courts in the State of California, and am an associate with Barger & Wolen, LLP, counsel of record for Metropolitan Life Insurance Company ("MetLife") defendant in this action. I am one of the attorneys with responsibility for the handling of this matter. I have personal knowledge of the matters set forth below, and if necessary could competently testify as to such matters.

2.     Attached hereto as Exhibit "A" is a true and correct copy of the Complaint in the above-referenced action. Attached hereto as Exhibit "B" is a true and correct copy of the relevant portion of MetLife's profile in the 2006 AM Best's Insurance Report, which shows MetLife's principal place of business is New York, and that MetLife is incorporated in New York.

I declare under the laws of the State of California and the United States that the foregoing is true and correct.

Executed this 16th day of May, 2007, at Los Angeles, California.

MICHAEL A. S. NEWMAN

ENDORSED
F I L E D
San Francisco County Superior Court

APR 1 0 2007

GORDON PARK-LI, Clerk
BY: _____ JUN P. PANELO
Deputy Clerk

1  Ray Bourhis, Esq. SBN 53196
   Lawrence Mann, Esq. SBN 83698
2  **BOURHIS & MANN**
   1050 Battery Street
3  San Francisco, CA 94111
4  Tel: (415) 392-4660
   Fax: (415) 421-0259
5
6  Attorneys for Plaintiff, EDWARD CONTRERAS
7

**CASE MANAGEMENT CONFERENCE SET**

SEP 0 7 2007 -9:00 AM

**DEPARTMENT 212**

8
9              **SUPERIOR COURT OF CALIFORNIA**
10           **CITY AND COUNTY OF SAN FRANCISCO**
11

| | |
|---|---|
| 11  EDWARD CONTRERAS, | Case No.: **CGC-07-462224** |
| 12          Plaintiff, | **COMPLAINT FOR BREACH OF CONTRACT, BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING, INTENTIONAL MISREPRESENTATION, INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS, MANDAMUS, DECLARATORY RELIEF, AND REQUEST FOR JURY TRIAL** |
| 13  v. | |
| 14  METROPOLITAN LIFE INSURANCE COMPANY, THE COMMISSIONER OF THE CALIFORNIA DEPARTMENT OF INSURANCE and DOES 1 – 50, inclusive, | |
| 17          Defendants. | |

19          Plaintiff EDWARD CONTRERAS ("CONTRERAS") hereby requests a jury trial on all

20  issues in this action.

21          COMES NOW, Plaintiff CONTRERAS and alleges as follows:

22                              I.
23                        **BACKGROUND**

24          1.  Plaintiff is and at all relevant times was a resident of the State of California.

25          2.  Upon information and belief, Plaintiff alleges that Defendant METROPOLITAN

26  LIFE INSURANCE COMPANY ("METLIFE") is and at all times herein mentioned was a

27  corporation authorized to transact and transacting the business of insurance in the State of

28  California.

**EXHIBIT A**          18

3.  The California Department of Insurance ("DOI") is a governmental agency unit of the State of California, and operates independently under the control of an elected Insurance Commissioner ("COMMISSIONER") pursuant to Insurance Code §12906.  The COMMISSIONER is required by Insurance Code § 12905 to maintain offices in San Francisco and the COMMISSIONER does so.

4.  The true names or capacities, whether individual, corporate, associate, or otherwise, of Defendants DOES 1 through 50, inclusive, are unknown to Plaintiff who therefore sues said Defendants by such fictitious names.  Plaintiff is informed and believes and on such information and belief alleges that each of the Defendants sued herein as a DOE is legally responsible in some manner for the events and happenings referred to herein, and will ask leave of this court to amend this complaint to insert their true names and capacities in place and instead of the fictitious names when the same become known to Plaintiff.

## II.
### FIRST CAUSE OF ACTION
**(Breach of Contract against Defendant METLIFE and DOES 1 - 10)**

As and for a FIRST CAUSE OF ACTION, Plaintiff complains against Defendant METLIFE and DOES 1 – 10 and alleges:

5.  Plaintiff incorporates by reference each and every paragraph of the complaint as though fully set forth in this cause of action.

6.  In or about 1995, Plaintiff was a Chief of Police, Department of Developmental Services, State of California, insured under and purchased Defendant METLIFE's Long Term Disability Plan No. Group # 98324 (the "POLICY"), attached hereto as Exhibit A.

7.  Under the POLICY: "Disability or Disabled means that, due to an Injury or Sickness, you require the regular care and attendance of a Doctor and:

1.    you are unable to perform each of the material duties of your regular job; and

2.    after the first 24 months of benefit payments, you must also be unable to perform each of the material duties of any gainful work or service for which you are reasonably qualified taking into consideration your training, education, experience and

2

Case No.
Complaint For Breach Of Contract, Bad Faith, Intentional Misrepresentation, Intentional Infliction, etc.

19

past earnings; or

       3.    you, while unable to perform all of the material duties of your regular job on a full-time basis, are:

          a.    performing at least one of the material duties of your regular job or any other gainful work or service on a part-time or full-time basis; and

          b.    earning currently at least 20% less per month than your Indexed Basic Monthly Earnings due to that same Injury or Sickness."

Under Plaintiff's POLICY, disability benefits shall equal $1,054.90 per month until age 65.

8. At all times relevant, Plaintiff's occupation was that of a Chief of Police. On March 25, 2003, Plaintiff became totally disabled with lumbar disc disease and chronic low back pain when Plaintiff was injured subduing a combative person. Plaintiff also has developed clinical depression.

9. Plaintiff attempted to return to work on a part-time basis. This effort failed, causing him severe exacerbated pain and further injury.

10. Plaintiff, as a result of being totally disabled, submitted his claim for disability benefits with METLIFE on or about March 25, 2003. As a result and following its investigation into Plaintiff's condition, METLIFE paid Plaintiff his policy benefits for two years.

11. Throughout the above period, Plaintiff performed all obligations required of him by the POLICY. Plaintiff intended and expected to be assured of peace of mind and financial and economic security as a result of METLIFE's obligations to Plaintiff under the POLICY here in issue.

12. On or about December 23, 2005, METLIFE employee Carol Katanich, acting in her capacity as a METLIFE authorized company representative and managing agent, intentionally misrepresented to Plaintiff that he could perform various police occupations, and that he was not entitled to benefits under the POLICY.

13. Despite Plaintiff's medical condition, and absent any evaluation of Plaintiff's disability by a physician of METLIFE's choosing, by letter of December 23, 2005, METLIFE

3

Case No.
Complaint For Breach Of Contract, Bad Faith, Intentional Misrepresentation, Intentional Infliction, etc.

20

1  denied Plaintiff's disability claim for disability benefits. METLIFE in terminating Plaintiff's

2  benefits, fraudulently and unfairly asserted and claimed that Plaintiff was not disabled.

3  14. Plaintiff at all times herein relevant supplied METLIFE with ongoing reports from his

4  medical doctors who had examined Plaintiff and found him to be totally disabled, and did

5  everything else required of him by the POLICY.

6  15. Notwithstanding its obligation to do so, Defendants METLIFE and Does 1-10 have

7  failed and refused, and continue to fail and refuse, to pay Plaintiff the disability benefits to which

8  he is entitled under the POLICY. Said failures and refusals constitute a material breach and an

9  ongoing material breach of the POLICY.

10  16. As a direct and proximate result of said breach, Plaintiff has been injured and

11  damaged in an amount to be determined according to proof at trial.

12  WHEREFORE, Plaintiff prays judgment against Defendants, and each of them, as

13  hereinafter set forth.

14
### III.
### SECOND CAUSE OF ACTION
15
**(Breach of the Covenant of Good Faith and Fair Dealing**
16  **Against Defendant METLIFE and DOES 1 - 20)**

17  As and for a SECOND CAUSE OF ACTION, Plaintiff complains against Defendants

18  METLIFE and DOES 1 – 20 and alleges:

19  17. Plaintiff incorporates by reference each and every paragraph of the complaint as

20  though fully set forth in this cause of action.

21  18. At all times herein relevant, said Defendants agreed to act in good faith and deal

22  fairly with Plaintiff and his employer when they issued the POLICY. Said Defendants thereby

23  assumed a special relationship with, and fiduciary-like obligations to, Plaintiff, and agreed to

24  abide by its said duties. Nevertheless, Defendants breached said obligations, as is set forth more

25  particularly below.

26  19. In the absence of a reasonable basis for doing so, and with full knowledge and/or

27  conscious disregard of the consequences, Defendant METLIFE has failed and refused to pay

28  Plaintiff the benefits owed under the POLICY and the laws of California.

4

Case No.
Complaint For Breach Of Contract, Bad Faith, Intentional Misrepresentation, Intentional Infliction, etc.

21

20. Plaintiff alleges that Defendant METLIFE designed a scheme and conspired to produce a biased internal "medical review" that would provide a pretext for the termination of Plaintiff's disability benefits.  This scheme included, but was not limited to the following:

      a.      Defendant METLIFE employed in-house medical personnel, knowing that these medical personnel would write reports and or issue opinions disavowing Plaintiff's disability, thereby providing a pretext for the termination of Plaintiff's benefits;

      b.      Plaintiff further alleges that Defendant METLIFE had previously employed, and continues to employ, the services of in-house medical personnel for the purpose of providing nonobjective medical reports and or opinions to be used  pretexts for denying legitimate disability claims;

21.    Additionally, said Defendants engaged and continue to engage in a course of conduct to further their own economic interest and in violation of their contractual and fiduciary obligations to Plaintiff including, but not limited to:

      a.      Misrepresenting pertinent provisions and coverage of the POLICY at issue;

      b.      Failing to objectively evaluate Plaintiff's claim and attempting to find reasons not to pay the claim rather than conducting a full and fair investigation;

      c.      Searching for bases upon which to deny rather than grant policy benefits, including but not limited to forcing Plaintiff to submit to a biased medical examination or threatening to so do;

      d.      Unreasonably failing to pay the benefits due under the POLICY;

      e.      Wrongful withholding of disability benefits owing to Plaintiff;

      f.      Failing to place the financial interests of Plaintiff on an equal par with their own financial interests;

      g.      Forcing Plaintiff to hire an attorney to institute litigation to recover the amounts due him under his insurance POLICY;

      h.      Other wrongful and illegal conduct according to proof at trial.

5

Case No.
Complaint For Breach Of Contract, Bad Faith, Intentional Misrepresentation, Intentional Infliction, etc.

22

1     22.    Defendants' actions were part of a pattern and practice of denying and terminating

2  long-term disability income claims on specious bases in order to reduce overall reserves and

3  improve the company's financial condition.

4     23.    In doing the acts listed above, Defendants breached the covenant of good faith

5  and fair dealing, and engaged in unfair claims settlement practices.

6     24.    Defendants continue to engage in the aforementioned acts, and said conduct and

7  bad faith constitutes a continuing tort and continuing bad faith to Plaintiff, causing Plaintiff

8  continuing damage as described herein beyond the date of the filing of this action.

9     25.    As a direct and proximate result of the aforementioned conduct of Defendants,

10  Plaintiff has been and continues to be damaged in an amount in excess of the jurisdiction of this

11  court, to be determined at the time of trial.

12     26.    As a further, direct and proximate result of the aforementioned conduct of

13  Defendants, Plaintiff has suffered mental and emotional distress including, but not limited to,

14  fear, aggravation, depression, and anxiety and has thereby incurred general damages in a sum in

15  excess of the jurisdiction of this Court to be determined according to proof at time of trial.

16     27.    As a further, direct and proximate result of the aforementioned conduct of

17  Defendants, Plaintiff has been obliged to expend or incur liability for costs of suit, attorneys'

18  fees, and related expenses in an amount not yet fully ascertained, but which will be submitted at

19  the time of trial.

20     28.    As a further, direct and proximate result of the aforementioned conduct of

21  Defendants, Plaintiff has suffered other special damages in amounts according to proof at the

22  time of trial which include, but are not limited to, the lack of availability of said sums to him.

23     29.    The conduct of Defendants as described above was despicable and fraudulent and

24  was further done willfully, oppressively, maliciously, and with conscious disregard of the rights

25  of Plaintiff, and with the intent to annoy, harass or injure Plaintiff such that Plaintiff is entitled to

26  a recovery of exemplary damages.

27     WHEREFORE, Plaintiff prays judgment against Defendant, as hereinafter set forth.

28

6

Case No.

**Complaint For Breach Of Contract, Bad Faith, Intentional Misrepresentation, Intentional Infliction, etc.**

IV.
## THIRD CAUSE OF ACTION
(Intentional Misrepresentation against Defendants METLIFE and DOES 1- 30)

As and for a THIRD CAUSE OF ACTION, Plaintiff complains against Defendants METLIFE and DOES 1 – 30 and alleges:

30.     Plaintiff incorporates by reference each and every paragraph of the complaint as though set forth in this cause of action.

31.     On or about December 23, 2005, METLIFE employee Carol Katanich, acting in her capacity as a METLIFE authorized company representative, intentionally misrepresented to Plaintiff that he could perform various police occupations, and that he was not entitled to benefits under the POLICY.

32.     Said representations were false, in that Defendants intentionally misstated the terms of Plaintiff's POLICY and California law, and was made with the intent to deceive and defraud Plaintiff, and in bad faith and was made for the purpose to force Plaintiff to seek legal counsel to recover the disability benefits he was due.

33.     Upon information and belief, Defendant METLIFE has a pattern and practice of terminating the payment of disability benefits without cause in order to increase profits.

34.     In the POLICY, and at its inception, METLIFE represented to Plaintiff that it would pay and continue to pay monies to Plaintiff **when Defendant METLIFE determined** that Plaintiff was disabled.  At the time said representation was made by Defendant, it was false and in violation of the minimum standards in California for total disability.  At the time said representation was made, Defendant METLIFE was acting with the intent to deceive and defraud Plaintiff, in bad faith, and to further METLIFE's financial interest at the expense of Plaintiff's financial interests.

35.     Said representations were false and was made with the intent to deceive and defraud Plaintiff, was made in bad faith, and was made for the purpose of depriving Plaintiff of the right to a jury trial, of Plaintiff's right to seek redress in California state courts, and was made to force Plaintiff to seek legal counsel to recover the disability benefits he was due.

Case No.
Complaint For Breach Of Contract, Bad Faith, Intentional Misrepresentation, Intentional Infliction, etc.

36.     As a direct and proximate result of the aforementioned conduct of Defendants, Plaintiff has been damaged in an amount in excess of the jurisdiction of this court, to be proven at trial.

37.     As a further, direct and proximate result of the aforementioned conduct of Defendants, Plaintiff has suffered mental and emotional distress including, but not limited to, fear, aggravated depression, nervousness, humiliation and anxiety and has thereby incurred general damages in a sum in excess of the jurisdiction of this Court to be determined according to proof at time of trial.

38.     As a further, direct and proximate result of the aforementioned conduct of Defendants, Plaintiff has been obliged to expend or incur liability for costs of suit, attorney's fees and related expenses in an amount not yet fully ascertained, but which will be submitted at the time of trial.

39.     As a further, direct and proximate result of the aforementioned conduct of Defendants, Plaintiff has suffered other special damages in amounts according to proof at the time of trial which include, but are not limited to, the lack of availability of said sums to her. The conduct of Defendants as described above was despicable and fraudulent and was further done willfully, oppressively, maliciously, and with conscious disregard of the rights of Plaintiff, and with the intent to annoy, harass or injure Plaintiff such that Plaintiff is entitled to a recovery of exemplary damages.

WHEREFORE, Plaintiff prays for judgment against Defendants, and each of them, as hereinafter set forth.

## V.
## FOURTH CAUSE OF ACTION
### (Intentional Infliction Of Emotional Distress Against
### Defendants METLIFE and DOES 1 - 40)

As and for a FOURTH CAUSE OF ACTION, Plaintiff complains against Defendants METLIFE and DOES 1 – 40 and alleges:

40.  Plaintiff reincorporates by reference each and every paragraph of the Complaint as though fully set forth in this cause of action.

8

Case No.
Complaint For Breach Of Contract, Bad Faith, Intentional Misrepresentation, Intentional Infliction, etc.

25

41. Defendants had access to Plaintiff's medical records, and were aware, at all relevant times, that Plaintiff was disabled and that he relied on his disability benefits for financial support.

42. With full knowledge of Plaintiff's precarious condition, including but not limited to his degenerative disc disease in his lumbar spine, and of the fact that he was entitled to total disability benefits under the POLICY, Defendants METLIFE and Does 1 – 40 failed to pay him the benefits owed under his policy.

43. With full knowledge of Plaintiff's precarious condition, and of the fact that he was entitled to disability benefits under the POLICY, Defendants METLIFE and Does 1- 40 terminated his benefits.

44. Specifically, but not exclusively, Defendants METLIFE and Does 1 – 40 failed to pay Plaintiff benefits for total disability by misrepresenting California law, by misrepresenting Plaintiff's medical condition, by ignoring the wealth of medical information supporting Plaintiff's disability, and by misrepresenting Plaintiff's rights under his POLICY.

45. Furthermore, Defendants METLIFE and Does 1 – 40 did no independent investigation of Plaintiff's medical condition or his work conditions.

46. With full knowledge of Plaintiff's precarious condition, and of the fact that he was entitled to disability benefits under the POLICY, Defendants METLIFE and Does 1 – 40 conspired to produce a biased in-house medical review that would and did provide a pretext for terminating Plaintiff's disability benefits.

47. Plaintiff alleges that Defendant METLIFE receives substantial financial gain from such unfair claims handling practices.

48. In so doing, Defendants pursued an outrageous course of conduct, intentionally and/or recklessly, proximately causing Plaintiff severe emotional distress, shock and other highly unpleasant emotions.

49. Defendants conduct caused Plaintiff severe emotional distress, anxiety and despair, all for the purposes of injuring Plaintiff, and increasing Defendants' profits, while inflicting severe emotional distress and avoiding a valid claim.

///

9

Case No.
Complaint For Breach Of Contract, Bad Faith, Intentional Misrepresentation, Intentional Infliction, etc.

1    50.  As a direct and proximate result of the aforementioned conduct of Defendants,

2  Plaintiff has been damaged in the amount of the disability benefits due and owing to him and

3  continuing hereinafter until fully paid.

4    51.  As a further, direct and proximate result of the aforementioned conduct of

5  Defendants, Plaintiff has suffered mental and emotional distress including, but not limited to,

6  frustration, depression, nervousness, and anxiety and has thereby incurred general damages in an

7  amount to be determined according to proof at time of trial.

8    52.  As a further, direct and proximate result of the aforementioned conduct of

9  Defendants, Plaintiff has been obliged to expend and/or incur liability for costs of suit, attorneys'

10  fees, and related expenses in an amount not yet fully ascertained, but which will be submitted at

11  the time of trial.

12    53.  As a further, direct and proximate result of the aforementioned conduct of

13  Defendants, Plaintiff has suffered other special damages in amounts according to proof at the

14  time of trial which include, but are not limited to, the lack of availability of said sums to him.

15    54.  The conduct of Defendants as described above was despicable and fraudulent and

16  was further done willfully, oppressively, maliciously, and with conscious disregard of the rights

17  of Plaintiff, and with the intent to annoy, harass or injure Plaintiff such that Plaintiff is entitled to

18  a recovery of exemplary damages.

19    WHEREFORE, Plaintiff prays for judgment against Defendants, and each of them, as

20  hereinafter set forth.

21                                      **VI.**

22                          **FIFTH CAUSE OF ACTION**

23    **(Writ of Mandamus: Commissioner of the California Department of Insurance)**

24    55.    Plaintiff incorporates by reference each and every paragraph of his Complaint as

25  though set forth in this cause of action.

26    56.    The California Department of Insurance (hereinafter "DOI") is a governmental

27  agency unit of the State of California, and operates independently under the control of an elected

28  Insurance Commissioner ("hereinafter COMMISSIONER") pursuant to Insurance Code §12906.

10

Case No.
Complaint For Breach Of Contract, Bad Faith, Intentional Misrepresentation, Intentional Infliction, etc.

27

1  The COMMISSIONER is required by Insurance Code § 12905 to maintain offices in San

2  Francisco and the COMMISSIONER does so.

3     57.    The COMMISSIONER must approve all group disability insurance policies for

4  sale, issuance or delivery in California pursuant to Insurance Code §10270.9.  The

5  COMMISSIONER is required to rigorously apply standards in order to "prevent, in respect to

6  disability insurance, fraud, unfair trade practices and insurance economically unsound to the

7  insured." §10291.5(a)(1).  Further, the COMMISSIONER is prohibited by law from approving

8  any disability policy which is uncertain, ambiguous or likely to mislead a person to whom the

9  policy is offered, delivered or issued. §10291.5(b)(1).

10    58.    On information and belief, Plaintiff alleges that pursuant to Insurance Code

11 §10270.9, the insurer Defendants filed a copy of the policy and or policy form here in issue with

12 the Commissioner.

13    59.    On information and belief, Plaintiff alleges that pursuant to Insurance Code

14 §10270.9, the Commissioner approved for sale in California the policy and or policy form here

15 in issue.

16    60.    The Insurance Code prohibits disability policy provisions less favorable in any

17 respect to an insured than required by law; for example, §§10328 and 10390.

18    61.    Insurance Code § 12921 mandates that "The COMMISSIONER shall perform all

19 duties imposed upon him by provisions of this code and other laws regulating the business of

20 insurance in this State, and shall enforce the execution of such provisions and laws."  Section

21 12926 mandates that "The COMMISSIONER shall require from every insurer a full compliance

22 with all provisions of (the insurance) code."

23    62.    Plaintiff alleges that the COMMISSIONER has abused his discretion by

24 approving a policy or policy form, or by allowing Defendant insurers to sell the policy and or

25 policy forms her in issue, in violation of the Insurance Code.

26    63.    Insurance Code §12940 provides that "The acts and orders of the

27 COMMISSIONER are subject to such review, or other action by a court of competent

28 jurisdiction, as is permitted or authorized by law."

11

Case No.
**Complaint For Breach Of Contract, Bad Faith, Intentional Misrepresentation, Intentional Infliction, etc.**

64.    A writ of mandamus is the proper method for Plaintiff to obtain judicial review of the Commissioner's alleged approval of Plaintiff's policy and or policy form.

65.    The Insurance Code does not provide an administrative remedy for Plaintiff to contest the Commissioner's alleged approval of Plaintiff's policy and or policy form.

66.    Plaintiff has no other plain, speedy and adequate alternative remedy by which to contest the language of her policy and or the Commissioner's approval of the policy and or policy form.

67.    On information and belief, Plaintiff hereby alleges that the COMMISSIONER and the DOI have failed to enforce the mandatory minimum requirements of the Insurance Code with respect to policy definitions of disability, and related policy provisions respecting proof of claim, payment of claim, and adjudication of claim, contained in Defendants' insurance policy that are at variance with and less favorable to their insureds and disability claimants than required by California law.

68.    On information and belief, Plaintiff alleges that the COMMISSIONER and DOI have failed to perform the duties imposed upon the COMMISSIONER to require compliance with the California Insurance Code, including but not limited to §§790.03(h) and 10291.5, as well as the Fair Claims Settlement Practices Regulations (10 Cal.Admin. Code §2695.1 *et seq*) and various DOI rulings and bulletins dealing with the same or similar subject matter. The acts and omissions of the DOI have contributed to Defendants' ability to perpetuate the unlawful, fraudulent and or other wrong acts alleged herein.

69.    Plaintiff further alleges that the Commissioner has abused his discretion by approving a policy and or policy forms in violation of either Cal.Ins.Code §§10291.5(a) and 10291.5(b)(1), or the Commissioner's own regulations implementing the Insurance Code.

70.    By this action, Plaintiff seeks, in addition to all other remedies sought herein, an order from this Court mandating that the COMMISSIONER exercise his discretion and take such action as he may decide is reasonably necessary to respond to the alleged fraudulent and unlawful conduct of Defendants.

///

12

Case No.
Complaint For Breach Of Contract, Bad Faith, Intentional Misrepresentation, Intentional Infliction, etc.

29

71.    By this action Plaintiff seeks, in addition to all other remedies sought herein, an order from this Court mandating that the COMMISSIONER revoke and or rescind his approval of Plaintiff's policy and or policy forms, pursuant to Cal. Civ. Proc. 1094.5, *Bunnett v. Regents of Univ. of Cal.* (1995) 35 Cal.App.4[th] 843, 848; *Bixby v. Pierno* (1971) 4 Cal.3d 130, 137; *Peterson v. American Life & Health Ins. Co.* 48 F.3d 404, 410 (9[th]Cir. 1995); and *Van Ness v. Blue Cross of Cal.* (2001) 87 Cal.App.4[th] 364, 371-72.

## VII.
## SIXTH CAUSE OF ACTION
### (Declaratory Relief: Commissioner of the California Department of Insurance Under Code of Civil Procedure § 1060)

Plaintiff incorporates by reference each and every paragraph of his Complaint as though set forth in this cause of action.

72.    On information and belief, Plaintiff alleges that pursuant to Insurance Code §10270.9, the insurer Defendants filed a copy of the policy and or policy form here in issue with the Commissioner.

73.    On information and belief, Plaintiff alleges that pursuant to Insurance Code §10270.9, the Commissioner approved for sale in California the policy and or policy form here in issue.

74.    An actual controversy exists between Plaintiff and Defendants and between Plaintiff and the Commissioner arising out of the Commissioner's alleged approval of the policy and or policy form at issue in this case.

75.    Pursuant to Ins. Code §10270.9, "[n]o group disability policy shall be issued or delivered in this state … until a copy of the form of the policy is filed with the commissioner and approved by him … ."

76.    Plaintiff herein seeks a Declaration from the Court ruling that Plaintiff's policy does not conform to the minimum standards for total disability in the State of California and, pursuant to Insurance Code §10291.5(b)(1), for a declaration that the insurer Defendants may not use the Commissioner's approval of the policy and or policy form here in issue to claim that the policy is not unintelligible, uncertain, ambiguous or abstruse, or likely to mislead.

13

Case No.
Complaint For Breach Of Contract, Bad Faith, Intentional Misrepresentation, Intentional Infliction, etc.

77.    Plaintiff herein further seeks an order from the Court declaring that the policy and or policy forms here in issue are ambiguous or misleading and that the Commissioner has abused his mandatory duty not to approve a policy that is ambiguous or misleading, pursuant to Cal.Ins. Code §10291.5(b)(1).

WHEREFORE, Plaintiff prays for judgment against Defendants, and each of them, as hereinafter set forth.

## VIII.

### PRAYER FOR RELIEF

**AS TO THE FIRST, SECOND, THIRD AND FOURTH CAUSES OF ACTION:**

WHEREFORE, Plaintiff prays for relief as follows:

1.    General damages for failure to provide benefits under the subject contract of insurance in a sum to be determined at the time of trial;

2.    General damages for mental and emotional distress and other incidental damages in a sum to be determined at the time of trial;

3.    Punitive and exemplary damages;

4.    For costs of suit herein incurred;

5.    For reasonable attorney's fees;

6.    Special damages in an amount according to proof;

7.    For such other and further relief as the Court deems just and proper.

**AS TO THE FIFTH CAUSE OF ACTION:**

WHEREFORE, Plaintiff prays for relief as follows:

8.    In addition to all other remedies sought herein, an order from this Court mandating that the COMMISSIONER exercise his discretion and take such action as he may decide is reasonably necessary to respond to the alleged fraudulent and unlawful conduct of Defendants;

9.    In addition to all other remedies sought herein, an order from this Court mandating that the COMMISSIONER revoke and or rescind his approval of Plaintiff's policy and or policy forms, pursuant to Cal. Civ. Proc. 1094.5, *Bunnett v. Regents of Univ. of Cal.*

14

Case No.
Complaint For Breach Of Contract, Bad Faith, Intentional Misrepresentation, Intentional Infliction, etc.

31

1 | (1995) 35 Cal.App.4th 843, 848; *Bixby v. Pierno* (1971) 4 Cal.3d 130, 137; *Peterson v. American*

2 | *Life & Health Ins.Co.* 48 F.3d 404, 410 (9thCir. 1995); and *Van Ness v. Blue Cross of Cal.* (2001)

3 | 87 Cal.App.4th 364, 371-72;

4 |      10.    For such other and further relief as the Court deems just and proper.

5 | **AS TO THE SIXTH CAUSE OF ACTION:**

6 | WHEREFORE, Plaintiff prays for relief as follows:

7 |      11.    In addition to all other remedies sought herein, a Declaration from the Court

8 | ruling that Plaintiff's policy does not conform to the minimum standards for total disability in the

9 | State of California and, pursuant to Insurance Code §10291.5(b)(1),

10 |      12.    In addition to all other remedies sought herein, a Declaration from the Court that

11 | the insurer Defendant may not use the Commissioner's approval of the policy and or policy

12 | forms here in issue to claim that the policy is not unintelligible, uncertain, ambiguous or

13 | abstruse, or likely to mislead;

14 |      13.    In addition to all other remedies sought herein, a Declaration from the Court that

15 | the policy and or policy forms here in issue are ambiguous or misleading and that the

16 | Commissioner has abused his mandatory duty not to approve a policy that is ambiguous or

17 | misleading, pursuant to Insurance Code §10291.5(b)(1);

18 |      14.    For such other and further relief as the Court deems just and proper.

19 |

20 | DATED: April 10, 2007              Respectfully submitted,

21 |

22 |                        **BOURHIS & MANN**

23 |

24 |                By:   *Ray Bourhis*

25 |                      Ray Bourhis

26 |                      Lawrence Mann
                       Attorneys for Plaintiff EDWARD CONTRERAS

27 |

28 |

Case No.
**Complaint For Breach Of Contract, Bad Faith, Intentional Misrepresentation, Intentional Infliction, etc.**



# YOUR EMPLOYEE
# BENEFIT PLAN

## STATE OF CALIFORNIA



**Long Term Disability**



EXHIBIT "A"

State of California
1515 S Street, North Building, Suite 400
Sacramento, CA 95814

TO OUR EMPLOYEES:

All of us appreciate the protection and security insurance provides.

This certificate describes the benefits that are available to you. We urge you to read it carefully.

Benefits are provided through a group policy issued to State of California by Metropolitan Life Insurance Company.

State of California

# MetLife®

Metropolitan Life Insurance Company
One Madison Avenue, New York, New York 10010-3690

Certifies that, under and subject to the terms and conditions of the Group Policy issued to the Employer, coverage is provided for each Employee as defined herein.

The date when an Employee is eligible for coverage is set forth in the form with the title Eligibility for Benefits.

The date when an Employee's Personal Benefits become effective is set forth in the form with the title Effective Dates of Personal Benefits.

The amounts of coverage are determined by the form with the title Schedule of Benefits.

Robert H. Benmosche
Chairman, President and Chief Executive Officer

Employer:    **State of California**

Group Policy No.:    **98324-G**

**Florida Residents: The benefits of the policy providing your coverage are governed primarily by the law of a state other than Florida.**

PLEASE AFFIX THE STICKER
SHOWING THE EMPLOYER'S
NAME IN THIS SPACE

If any prior certificate relating to the coverage set forth herein has been given to the Employee, such certificate is void.

Form G.23000-Cert-1

-ii-

## For Texas Residents:

### IMPORTANT NOTICE

To obtain information or make a complaint:

You may call MetLife's toll-free telephone number for information or to make a complaint at

1-800-638-5433

You may contact the Texas Department of Insurance to obtain information on companies, coverages, rights or complaints at

1-800-252-3439

You may write the Texas Department of Insurance
P.O. Box 149104
Austin, TX 78714-9104
Fax # 512 - 475-1771

**PREMIUM OR CLAIM DISPUTES:** Should you have a dispute concerning your premium or about a claim you should contact MetLife first. If the dispute is not resolved, you may contact the Texas Department of Insurance.

**ATTACH THIS NOTICE TO YOUR CERTIFICATE:** This notice is for information only and does not become a part or condition of the attached document.

## Para Residentes de Texas:

### AVISO IMPORTANTE

Para obtener información o para someter una queja:

Usted puede llamar al número de teléfono gratis de MetLife para información o para someter una queja al

1-800-638-5433

Puede comunicarse con el Departamento de Seguros de Texas para obtener información acerca de compañías, coberturas, derechos o quejas al

1-800-252-3439

Puede escribir al Departamento de Seguros de Texas
P.O. Box 149104
Austin, TX 78714-9104
Fax # 512 - 475-1771

**DISPUTAS SOBRE PRIMAS O RECLAMOS:** Si tiene una disputa concerniente a su prima o a un reclamo, debe comunicarse con MetLife primero. Si no se resuelve la disputa, puede entonces comunicarse con el departamento (TDI).

**UNA ESTE AVISO A SU CERTIFICADO:** Este aviso es solo para propósito de información y no se convierte en parte o condición del documento adjunto.

-iii-

35

Arkansas residents please be advised of the following:

## IMPORTANT NOTICE

IF YOU HAVE A QUESTION CONCERNING YOUR COVERAGE OR A CLAIM, FIRST CONTACT YOUR GROUP EMPLOYER OR GROUP ACCOUNT ADMINISTRATOR. IF, AFTER DOING SO, YOU STILL HAVE A CONCERN, YOU MAY CALL METLIFE'S TOLL-FREE TELEPHONE NUMBER:

1-800-275-4638

IF YOU ARE STILL CONCERNED AFTER CONTACTING BOTH YOUR GROUP EMPLOYER AND METLIFE, YOU SHOULD FEEL FREE TO CONTACT:

ARKANSAS INSURANCE DEPARTMENT
CONSUMER SERVICES DIVISION
1200 WEST THIRD
LITTLE ROCK, ARKANSAS 72201-1904

-iv-

California residents please be advised of the following:

## IMPORTANT NOTICE

TO OBTAIN ADDITIONAL INFORMATION, OR TO MAKE A COMPLAINT, CONTACT METLIFE AT:

METROPOLITAN LIFE INSURANCE
COMPANY
1 MADISON AVENUE
NEW YORK, NY 10010
ATTN: CORPORATE CONSUMER RELATIONS
DEPARTMENT
1-800-275-4638

IF, AFTER CONTACTING METLIFE REGARDING A COMPLAINT, YOU FEEL THAT A SATISFACTORY RESOLUTION HAS NOT BEEN REACHED, YOU MAY FILE A COMPLAINT WITH THE CALIFORNIA INSURANCE DEPARTMENT AT:

CALIFORNIA DEPARTMENT OF INSURANCE
300 SOUTH SPRING STREET
LOS ANGELES, CA 90013
1-800-927-4357 (within California)
1-213-897-8921 (outside California)

-v-

Georgia residents please be advised of the following:

## IMPORTANT NOTICE

**The laws of the state of Georgia prohibit insurers from unfairly discriminating against any person based upon his or her status as a victim of family violence.**

-vi-

# TABLE OF CONTENTS

Section                                                                 Page

SCHEDULE OF BENEFITS
(Also see SCHEDULE SUPPLEMENT) ................................. 1

SCHEDULE SUPPLEMENT ............................................. 4

DEFINITIONS OF CERTAIN TERMS USED HEREIN ......... 5

ELIGIBILITY FOR BENEFITS .......................................... 7

EFFECTIVE DATES OF PERSONAL BENEFITS.............. 7

LONG TERM DISABILITY BENEFITS ............................. 9

CLAIM PROCEDURE FOR
LONG TERM DISABILITY BENEFITS ............................. 23

PROVISIONS APPLICABLE TO PREGNANCY ............... 24

WHEN BENEFITS END................................................... 25

CONDITIONS UNDER WHICH YOUR ACTIVE
WORK IS DEEMED TO CONTINUE................................ 26

NOTICES ...................................................................... 27

-vii-

## SCHEDULE OF BENEFITS
### (Also see SCHEDULE SUPPLEMENT)

BENEFITS (EMPLOYEE ONLY)

**LONG TERM DISABILITY**

Elimination Period...................................... 6 months of disability ·

**Monthly Benefit:**

The Monthly Benefit is the lesser of:

1.  The Maximum Monthly Benefit shown below minus Other Income Benefits; or

2.  65% of Basic Monthly Earnings minus Other Income Benefits.

**Maximum Monthly Benefit** ...................................... $6,000

**Minimum Monthly Benefit** ............. 10% of the Monthly Benefit before reduction for Other Income Benefits or $100, whichever is greater

Other Income Benefits are described in Section C of LONG TERM DISABILITY BENEFITS.

When you work while Disabled, you will receive the sum of the following amounts:

1.  Your Monthly Benefit;

2.  The amount of your earnings for working while Disabled;

3.  The amount of Child Care Expense Benefit for which you are eligible.

38

However, after the first 24 months of Monthly Benefit payments if you are performing any gainful work or service while Disabled, the Monthly Benefit will be reduced by 50% of any compensation earned. Any evidence needed to verify your earnings must be given to us when requested.

During any period of Disability, the total of Monthly Benefit payments plus income earned while Disabled plus Child Care Expense Benefit cannot exceed 100% of your Indexed Basic Monthly Earnings.

**Rehabilitation Incentive:**

While Disabled, when you participate in a rehabilitation program approved by us, your Monthly Benefit percentage is increased by 5%.

**Child Care Expense Benefit:**

Up to $250.00 incurred per month for each eligible child during the first 24 months of Monthly Benefit payments, when you participate in a rehabilitation program approved by us.

**Maximum Benefit Duration:**

The Maximum Benefit Duration shall be the greater of:

1. the Benefit Duration limit as shown in the table below, or

2. your normal retirement age as defined by the Social Security Amendments of 1983.

| Age When Disability Begins | Benefit Duration |
|---|---|
| Less than 60 | To Age 65 |
| 60 | 60 Months |
| 61 | 48 Months |
| 62 | 42 Months |
| 63 | 36 Months |
| 64 | 30 Months |
| 65 | 24 Months |
| 66 | 21 Months |
| 67 | 18 Months |
| 68 | 15 Months |
| 69 and over | 12 Months |

## Increases and Decreases in Amount of Monthly Benefit

The amount of your Monthly Benefit may change as a result of a change in your earnings or class. The new Monthly Benefit amount:

1. will take effect on the date of the change; and

2. will apply only to Disabilities commencing thereafter.

There is an exception if you are not Actively at Work on the above date. In this case, the new Monthly Benefit amount will take effect on the date of return to Active Work.

Form G.23000-B

2

3

# SCHEDULE SUPPLEMENT

## A. Statements Made by You Which Relate to Insurability

Any statement made by you will be deemed a representation and not a warranty.

No such statement made by you which relates to insurability will be used:

1. in contesting the validity of the benefits with respect to which such statement was made; or

2. to reduce the benefits;

unless the conditions listed in items (a) and (b) below have been met:

  a. The statement must be contained in a written application which has been signed by you.

  b. A copy of the application has been furnished to you.

No such statement made by you will be used at all after such benefits have been in force prior to the contest for a period of two years during the lifetime of the person to whom the statement applies.

## B. Time Limit on Certain Defenses

After This Plan has been in force 2 years from the date of its issue, no statement of the Employer shall be used to void This Plan.

## C. Assignment

This certificate may not be assigned by you. Your benefits may not be assigned prior to a loss.

4

## D. Refund to Us for Overpayment of Benefits

If at any time we determine that the total amount paid on a claim is more than the total amount due, including any overpayment resulting from retroactive awards received from sources listed in Other Income Benefits, we have the right to recover the excess amount from the person to whom such payment was made. However, we, at our option, may recover the excess amount by reducing or offsetting against any future benefits payable to such person.

## E. Additional Provisions

1. The benefits under This Plan do not at any time provide paid-up insurance, or loan or cash values.

2. No agent has the authority:

  a. to accept or to waive the required notice or proof of a claim; nor

  b. to extend the time within which a notice or a proof must be given.

Form G.23000-B1

---

# DEFINITIONS OF CERTAIN TERMS USED HEREIN

"Actively at Work" or "Active Work" means that you are performing all of the material duties of your job with the Employer where these duties are normally carried out. If you were Actively at Work on your last scheduled working day, you will be deemed Actively at Work:

1. on a scheduled non-working day;

2. provided you are not disabled.

5

"Doctor" means a person who is legally licensed to practice medicine. A licensed practitioner will be considered a Doctor if:

1. there is a law which applies to This Plan and that law requires that any service performed by such a practitioner must be considered for benefits on the same basis as if the service were performed by a Doctor; and

2. the service performed by the practitioner is within the scope of his or her license.

"Employee" means a person classified as Managerial (M E59, E79, E99), Supervisory (S E48, E58, E68, E78, E98), Confidential (C E97), Excluded/Exempt (E88, E89) or EOI through E21, E67, E77 who is employed and paid for services by the Employer on a permanent, half time or greater time basis.

"Employer" means the individual, firm, or other organization in whose name the Group Policy is issued. Subsidiaries and/or affiliates of the Employer are not covered under This Plan unless they are specified or approved in writing by us.

"Personal Benefits" mean the benefits which are provided on account of an Employee under This Plan.

"This Plan" means the Group Policy which is issued by us to provide Personal Benefits.

"We", "us" and "our" mean Metropolitan.

"You" and "your" mean the Employee who is covered for Personal Benefits.

Form G.23000-A

## ELIGIBILITY FOR BENEFITS

### Personal Benefits Eligibility Date

If you are an Employee on January 1, 1999, that is your Personal Benefits Eligibility Date.

If you become an Employee after January 1, 1999, your Personal Benefits Eligibility Date is the date you become an Employee of the Employer.

Form G.23000-C

## EFFECTIVE DATES OF PERSONAL BENEFITS

### A. Request Forms

You must make a written request to the Employer for Personal Benefits. The request forms will be given to the Employer by us.

### B. If Timely Request Is Made

A timely request is one that is made on or prior to the date sixty days after your Personal Benefits Eligibility Date. If you are not Actively at Work as an Employee on your Personal Benefits Eligibility Date, a request will be timely if it is made on or prior to the date sixty days after the date you return to Active Work as an Employee.

If you make a timely request for Personal Benefits, your Personal Benefits will become effective on the date of the first premium deduction on or next following your Personal Benefits Eligibility Date, provided you are Actively at Work on that date, otherwise on the date you return to Active Work as an Employee.

C.  **If Late Request Is Made**

If a request is not a timely request, it is a late request.

If you make a late request for Personal Benefits, evidence of your good health must be given to us.

D.  **Evidence of Good Health - For Late Requests**

The evidence of good health is to be given at your expense.

Your Personal Benefits will become effective on the date such evidence of good health is accepted by us as satisfactory, subject to the Active Work Requirement.

If the evidence of your good health is not accepted by us as satisfactory, you will not be covered for any Personal Benefits.

E.  **Active Work Requirement**

You must be actively at work as an Employee in order for your Personal Benefits to become effective. If you are not actively at work as an Employee on the date when your Personal Benefits would otherwise become effective, your Personal Benefits will become effective on the date of your return to active work as an Employee.

F.  **Reinstatement of Benefits**

If your Personal Benefits end and because you do not make a required contribution to their cost, you may make a request to reinstate them. Such a request will be treated as if it were a late request in order to determine the effective date of your Personal Benefits.

If your Personal Benefits end, you may make a request to reinstate them. Reinstatement of your benefits is subject to the following:

1.  If your benefits end because you cease to be an Employee and you converted to Long Term Disability insurance provided under Metropolitan Life Insurance Company's Conversion Trust, and if you become an Employee again within 6 months, your Personal Benefits Eligibility Date will be the date you become an Employee.

8

---

2.  If you become covered again as described above, the Pre-existing Condition Limitation will be applied as if there had been no gap in coverage.

Form G.23000-D1

**LONG TERM DISABILITY BENEFITS**

A.  **Definitions**

"**Actively at Work**" or "**Active Work**" means that you are performing all of the material duties of your job with the Employer where these duties are normally carried out. If you were Actively at Work on your last scheduled working day, you will be deemed Actively at Work:

1.  on a scheduled non-working day;

2.  provided you are not disabled.

"**Basic Monthly Earnings**" means your monthly rate of pay from the Employer, excluding bonuses, overtime and other extra pay. Basic Monthly Earnings in effect as of the date of Disability will be used to compute your Monthly Benefit. Basic Monthly Earnings for you includes commissions which shall be averaged for the twenty-four months preceding the date Disability started, or from the date of employment if less than twenty-four months.

"**Calendar Year**" means a period of time which starts on any January 1 and ends on the next December 31.

9

42

"Consumer Price Index (CPI-W)" means the report published by the U.S. Department of Labor that measures the change in the cost of a typical urban wage earner's or clerical worker's purchases of certain goods and services. The change in cost is expressed as a percentage of the cost of those same goods or services in some base period.

"Disability" or "Disabled" means that, due to an Injury or Sickness, you require the regular care and attendance of a Doctor and:

1. you are unable to perform each of the material duties of your regular job; and

2. after the first 24 months of benefit payments, you must also be unable to perform each of the material duties of any gainful work or service for which you are reasonably qualified taking into consideration your training, education, experience and past earnings; or

3. you, while unable to perform all of the material duties of your regular job on a full-time basis, are:

a. performing at least one of the material duties of your regular job or any other gainful work or service on a part-time or full-time basis; and

b. earning currently at least 20% less per month than your Indexed Basic Monthly Earnings due to that same Injury or Sickness.

"Eligible Survivor" means your lawful spouse, if living, otherwise your children who are under age 25. The term "children" also includes stepchildren and legally adopted children.

"Elimination Period" means the number of consecutive days of Disability before Long Term Disability Benefits become payable under This Plan. Your Elimination Period:

1. is set forth in the SCHEDULE OF BENEFITS; and

2. begins on the first day of Disability.

Limited interruption of the Elimination Period is allowed for up to 30 days. However, any days of Active Work during this time will not count toward satisfying the Elimination Period. Further, this limited interruption of the Elimination Period will not apply if, while you are Actively at Work, you become eligible for any other group long term disability insurance.

"Full-time Student" means an unmarried student under 22 years of age who is attending an accredited college or university and registered for the required number of courses and/or credit hours to be considered "full-time" by the registrar of such institution.

"Gross Monthly Benefit" means your Monthly Benefit amount without any reductions for Other Income Benefits and compensation earned while you are Disabled.

"Hospital" means a facility which:

1. is legally licensed as a hospital; and;

2. provides a broad range of 24 hour a day medical and surgical services for sick and injured persons by, or under the supervision of, a staff of Doctors; and;

3. provides 24 hour a day nursing care by, or under the direction of, a Nurse.

"Indexed Basic Monthly Earnings" means Basic Monthly Earnings in effect on the date Disability began, increased by the lesser of:

1. 1/2 of the annual percentage change in the Consumer Price Index (CPI-W) for the prior Calendar Year

or

2. 10%

But in no case will the amount of any adjustment be less than $1.00.

The first increase will take place on the first of the month immediately following 12 months of continuous Disability. Subsequent increases will be compounded each year and take place on the anniversary of the first increase, provided you have been continuously receiving Disability Benefits under This Plan.

"Injury" means accidental bodily injury resulting independently of all other causes. The Injury must occur and Disability must begin while you are covered under This Plan.

"Medical Advice or Treatment" means:

1. medical treatment or consultation;

2. medical care or services;

3. diagnostic tests; or

4. taking of prescribed drugs or medicines.

"Mental Illness" means a mental, emotional or nervous condition of any kind.

"Pre-Existing Condition" means a Sickness or Injury for which you received Medical Advice or Treatment during the 12 month period immediately prior to your effective date of Personal Benefits.

"Recurrent Disability" means a Disability which is related or due to the same cause or causes as a prior Disability for which a Monthly Benefit was paid under This Plan.

"Retirement Plan" means a plan which provides retirement benefits to employees and which is not funded wholly by employee contributions. The term shall not include a profit sharing plan, a thrift plan, an individual retirement account (IRA), a tax-sheltered annuity (TSA), a stock ownership plan, a non-qualified plan of deferred compensation, or a 401(k) plan.

12

When used with the term Retirement Plan, "Disability Benefit" means money which:

1. is payable under a Retirement Plan, due to disability as defined in that plan; and

2. does not reduce the amount of money which would have been paid as retirement benefits at the normal retirement age under the plan if the disability had not occurred. (If the payment does cause such a reduction, it will be deemed a Retirement Benefit as defined below.)

When used with the term Retirement Plan, "Retirement Benefit" means money which:

1. is payable under a Retirement Plan either in a lump sum or in the form of periodic payments;

2. does not represent contributions made by you, and

NOTE: Payments which represent your contributions are deemed to be received over your expected remaining life regardless of when such payments are actually received.

3. is payable upon:

   a. voluntarily elected early retirement; or

   b. normal retirement.

"Sickness" means illness, disease or pregnancy.

B. Benefits

1. Disability Benefit

When we receive proof that you are Disabled, we will pay a Monthly Benefit in accordance with the SCHEDULE OF BENEFITS.

However, the amount of the Monthly Benefit when added to any compensation you may earn while Disabled, cannot exceed your Indexed Basic Monthly Earnings. When this

13

happens, your Monthly Benefit will be reduced by the amount in excess of your Indexed Basic Monthly Earnings.

The Monthly Benefit will be paid to you after completion of the Elimination Period, shown in the SCHEDULE OF BENEFITS, provided you remain Disabled and proof of continued Disability is submitted, at your expense, to us upon request.

The Monthly Benefit will stop on the earliest of:

a. the date that you cease to be Disabled;

b. the date of your death;

c. completion of the Maximum Benefit Duration shown in the SCHEDULE OF BENEFITS.

2. **Survivor Benefit**

If you die after satisfying the Elimination Period and while a Monthly Benefit is payable, we will pay to your Eligible Survivor a lump sum amount equal to 3 times your last Gross Monthly Benefit.

If payment becomes due to your unmarried children, payment will be divided equally among the children. Such payment will be made directly to the children or to a person named by us to receive payments on behalf of the children. This designation will be valid and effective against all claims by others who represent or claim to represent the children.

If no Eligible Survivor exists, no benefits will be paid.

3. **Waiver of Payments Benefit**

Payments normally required for you toward the cost of LONG TERM DISABILITY BENEFITS are waived during any period of Disability for which a Monthly Benefit is payable.

14

4. **Continuing Education Benefit**

While you are receiving a Monthly Benefit under This Plan, we will pay the following Continuing Education Benefit to you for your unmarried dependent children who are Full-time Students in an accredited college or university:

a. $100.00 per month per dependent child;

b. up to a maximum of 48 months per dependent child.

You must furnish us with proof that the unmarried dependent child is a Full-time Student in an accredited college or university. This proof must be given to us at the beginning of each semester or as often as reasonably required.

5. **Child Care Expense Benefit**

While Disabled, when you participate in rehabilitative employment approved by us, you will be reimbursed for Child Care Expense, as described in the SCHEDULE OF BENEFITS, for each eligible child, which is incurred during the first 24 months of Monthly Benefit payments.

An eligible child is your dependent child under age 13 who lives with you and is:

a. your child or your spouse's child;

b. your legally adopted child, or

c. a child for whom you are legal guardian.

Child Care Expense is the amount charged by a licensed child care provider who is not a member of your immediate family or living in your residence.

15

## C. Reduction of Benefits

The Monthly Benefit, as reduced by Other Income Benefits shown in the Table of Other Income Benefits, will be subject to the following:

1. **Minimum Benefit Amount**

The amount of the Monthly Benefit payable to you will not be less than the Minimum Monthly Benefit shown in the SCHEDULE OF BENEFITS.

2. **Cost of Living Freeze**

The Monthly Benefit will not be further reduced due to cost of living increases:

a. that are payable under Other Income Benefits; and

b. that occur after the initial reduction for these Other Income Benefits has been determined.

3. **Social Security Benefits**

The Monthly Benefit will not be payable unless:

a. you provide proof that you have applied for Social Security benefits; and

b. you have signed the Agreement Concerning Long Term Disability Benefits.

The Agreement Concerning Long Term Disability Benefits:

a. confirms that you will repay all overpayments; and

b. authorizes us to obtain the information on awards directly from the Social Security Administration.

Your Monthly Benefit may be reduced once you have received approval or final denial of your claim from the Social Security Administration. For purposes of this section, final

16

denial of your claim means that you have received a "Notice of Denial of Benefits" from an Administrative Law Judge.

In any case, when you do receive approval or final denial of your claim from the Social Security Administration:

a. your Monthly Benefit will be reduced from that point on by the amount of benefits you receive from Social Security each month; and

b. you must promptly refund to us an amount equal to all overpayments. If you do not promptly make such refund to us, we may, at our option, reduce or offset against any future benefits payable to you.

5. **Table of Other Income Benefits**

"Other Income Benefits" are those benefits below which apply to you and to your spouse, child or children as indicated.

The Other Income Benefits are:

a. The amount you receive or for which you are eligible under: (a) any Workers' or Workmen's Compensation law; (b) occupational disease law; and (c) any other act or law of like intent.

b. The amount of disability income benefits you receive or for which you are eligible under any Compulsory Benefit act or law.

c. The amount of any disability income benefit for which you are eligible under: (a) any other group insurance plan of the Employer; and (b) any governmental retirement system as a result of your job with the Employer.

d. The amount of any disability retirement or service retirement benefits you receive or are entitled to receive because of your disability or retirement from the Public Employee Retirement System (PERS).

17

e. The amount of benefits you receive under the Employer's Retirement Plan as follows: (a) any disability benefit; (b) any retirement benefits.

f. The amount of disability or retirement benefits under the United States Social Security Act or any other governmental disability or retirement program as follows: (a) disability or unreduced retirement benefits for which you, your spouse, child or children are eligible; or (b) reduced retirement benefits received by you, your spouse, child or children.

The above amounts, except for retirement benefits, are benefits resulting from the same disability for which a Monthly Benefit is payable under This Plan.

D. Recurrent Disability

1. If, after a period of Disability for which a Monthly Benefit has been paid under This Plan, you:

   a. resume your regular job on a full-time basis; and

   b. perform all the material duties for less than six consecutive months;

   any Recurrent Disability will be a part of the same period of Disability. Our liability for the entire period will be subject to the terms of This Plan for the prior Disability.

2. If, after a period of Disability for which a Monthly Benefit has been paid under This Plan, you:

   a. resume your regular job on a full-time basis; and

   b. perform all the material duties for six consecutive months or more;

   any Recurrent Disability will be treated as a new period of Disability. You must complete a new Elimination Period before Monthly Benefits are payable.

18

3. If you become eligible for coverage under any other group long term disability policy, this Recurrent Disability provision will not apply.

E. Exclusions/Limitations

General Exclusions

This Plan does not cover any Disability which results from or is caused or contributed to by:

1. war, insurrection, or rebellion;

2. active participation in a riot;

3. intentionally self-inflicted injuries or attempted suicide;

4. the commission of a felony.

Pre-Existing Condition Limitation

This Plan does not provide benefits for any Disability that is caused by, contributed to by, or resulting from a Pre-Existing Condition, unless the Disability begins after you have been covered under This Plan for 24 months in a row.

Mental Illness Limitation

While you are Disabled due to a Mental Illness and confined in a hospital or institution, the Monthly Benefit will be payable up to the Maximum Benefit Duration shown in the SCHEDULE OF BENEFITS.

While you are Disabled due to a Mental Illness and not confined in a hospital or institution, the Monthly Benefit will be payable up to the lesser of:

1. 24 months Lifetime; or

2. the Maximum Benefit Duration shown in the SCHEDULE OF BENEFITS.

19

But in no event will the Monthly Benefit be payable for longer than the Maximum Benefit Duration during a period of continuous Disability due to a Mental Illness, whether you are or are not confined in a hospital or institution.

### F. Continuity of Coverage Upon Transfer of Insurance Carriers

In order to prevent loss of your coverage because of a transfer of insurance carriers, This Plan will provide coverage for you as follows:

1. **Failure To Be Actively At Work Due To Injury Or Sickness**

   This Plan will cover you, if you:

   a. were covered under the prior carrier's plan at the time of transfer; and

   b. are not Actively at Work due to Injury or Sickness;

   provided the required payment toward the cost of LONG TERM DISABILITY BENEFITS is made to us for you.

   The benefit payable will be that which would have been paid by the prior carrier had coverage remained in force, less any benefit for which the prior carrier is liable.

2. **Disability Due To A Pre-Existing Condition**

   If you were covered under the prior carrier's plan at the time of transfer and Actively at Work and covered under This Plan on its effective date, benefits may be payable for a Disability due to a Pre-Existing Condition.

   a. If you satisfy the Pre-Existing Condition limitation, the benefit will be determined according to This Plan.

b. If you cannot satisfy This Plan's Pre-Existing Condition limitation, then:

   i. we will apply the Pre-Existing Condition limitation appearing in the prior carrier's plan; and

   ii. if you would have satisfied the Pre-Existing Condition limitation under the prior carrier's plan, giving consideration towards continuous time covered under This Plan and the prior carrier's plan, the benefit will be determined according to the lesser of This Plan or the prior carrier's plan.

However, no benefit will be paid if you cannot satisfy the Pre-Existing Condition limitation under (a) or (b) above.

### G. Conversion Privilege

1. You may be eligible to convert to a long term disability conversion plan when your coverage ends. Evidence of good health will not be required. However, you must meet the following conditions:

   a. you must have been covered under this Conversion Privilege, or a similar Conversion Privilege under a plan that This Plan replaced, for at least 12 months prior to the date your employment ends;

   b. your coverage under This Plan must end with the Employer must end for one of the following reasons:

   i. you resign;

   ii. you are terminated for cause;

iii. you are on a layoff or leave of absence which extends beyond the period stated in CONDITIONS UNDER WHICH YOUR ACTIVE WORK IS DEEMED TO CONTINUE.

iv. you have continued coverage for 24 months through direct payment as provided WHEN BENEFITS END.

c. you apply in writing and pay the first premium for the long term disability conversion plan within 31 days after your coverage under This Plan ends.

2. This Conversion Privilege is not available to you if:

a. your coverage under This Plan ends for any of the following reasons:

i. This Plan ends;

ii. This Plan is amended to exclude the class of Employees to which you belong;

iii. you no longer belong to a class of Employees eligible for coverage under This Plan;

iv. you retire;

v. you do not make a payment which is required by the Employer to the cost of This Plan.

b. you are Disabled under the terms of This Plan.

c. you become covered under any other long term disability plan within 31 days after your coverage under This Plan ends.

3. The form, benefits provided, premium, and other terms of the conversion coverage may differ from those provided under This Plan. We reserve the right to have the conversion coverage issued by another insurance company.

Form G.23000-6B

## CLAIM PROCEDURE FOR LONG TERM DISABILITY BENEFITS

A. **When Notice of Claim Must be Given**

Written notice of a claim must be given to us during the Elimination Period.

B. **Claim Forms**

When we receive written notice of a claim, we may furnish printed forms for filing proof of the claim. If we do not furnish printed forms within 15 days after you give us notice, you must furnish your own form of proof in writing.

Proof must describe the event, the nature and the extent of the cause for which a claim is made; it must be satisfactory to us.

C. **When Proof of Claim Must Be Given**

Written proof of a claim must be given to us not later than 90 days following the end of the Elimination Period.

D. **Late Notice or Proof**

If notice or proof is not given on time, the delay will not cause a claim to be denied or reduced as long as the notice or proof is given as soon as possible.

**E. Time Limits on Starting Lawsuits**

No lawsuit may be started to obtain benefits until 60 days after proof is given.

No lawsuit may be started more than 3 years after the time proof must be given.

**F. Medical Examinations**

While a claim is pending, we, at our expense, have the right to have you examined by Doctors of our choice when and as often as we reasonably choose.

**G. Time Limit for Payment of a Claim**

If the written proof of a claim:

a. has been made on time; and

b. is satisfactory to us;

we will pay the accrued benefits monthly at the end of the period for which they are due.

Form G.23000-H3

---

**PROVISIONS APPLICABLE TO PREGNANCY**

---

The Long Term Disability Benefits will be payable for a pregnancy (and the resulting childbirth) of an Employee. These benefits will be determined on the same basis as the benefits due to a sickness.

Form G.23000-M

---

# WHEN BENEFITS END

A. All of your benefits will end on the date your employment ends. Your employment ends when you cease Active Work as an Employee. However, for the purpose of benefits, the Employer may deem your employment to continue for certain absences. See CONDITIONS UNDER WHICH YOUR ACTIVE WORK IS DEEMED TO CONTINUE.

B. If This Plan ends in whole or in part, your benefits which are affected will end.

C. Your Long Term Disability Benefits will end as set forth in the LONG TERM DISABILITY BENEFITS provisions.

D. If you do not make a payment which is required by the Employer to the cost of any benefits, those benefits will end on the last day of the period for which a payment required by the Employer was made.

E. If you cease to be eligible for insurance because you no longer qualify as an Employee as defined in DEFINITIONS OF CERTAIN TERMS USED HEREIN, you may continue coverage for up to 24 months through direct payment, provided you maintain the qualifying time base. You must request to continue your Long Term Disability coverage within 30 days of loss of eligibility.

The end of any type of benefits on your account will not affect a claim which is incurred before those benefits ended, except as noted in both the definition of Elimination Period and the Recurrent Disability provision found in LONG TERM DISABILITY BENEFITS.

Form G.23000-F

## CONDITIONS UNDER WHICH YOUR ACTIVE WORK IS DEEMED TO CONTINUE

If you are not Actively at Work as an Employee because of a situation set forth below, the Employer may deem you to be in Active Work as an Employee only for the purpose of continuing your employment and only for the periods specified below in order that certain of your benefits under This Plan may be continued.

All such benefits will be subject to prior cessation as set forth in WHEN BENEFITS END.

In any case, the benefits will end on:

1. the date the Employer notifies us that your benefits are not to be continued; or

2. the end of the last period for which the Employer has paid premiums to us for your benefits.

### Your Sickness or Injury

The period determined in accordance with the Employer's general practice for an Employee in your job class.

### Your Leave of Absence or Lay Off

The period determined in accordance with the Employer's general practice for an Employee in your job class. However, the period will not be longer than two months following the date the leave of absence or lay off begins.

However, in the event the leave qualifies under the Family and Medical Leave Act of 1993 (FMLA), the period cannot be longer than 12 weeks in any 12 month period following the date the leave of absence begins.

Form G.23000 L

26

## NOTICES

This certificate is of value to you. It should be kept in a safe place. Your Eligible Survivor should know where the certificate is kept.

As soon as your benefits end, you should consult your Employer to find out what rights, if any, you may have to continue your protection.

The insurance evidenced by this certificate is not in lieu of and does not affect any requirement for coverage by workers' compensation insurance.

If you had coverage under a prior plan of benefits, please consult your Employer to determine if there are any additional provisions which affect your benefits under This Plan.

If you cease to be actively at work as an Employee as a result of a labor dispute, arrangements may be made by your Employer to continue your Personal Benefits. You may continue these benefits:

1. for a period of not longer than 6 months; and

2. only if certain conditions of This Plan are met.

One of these conditions is that at least 75% of the Employees make the required payments to the cost of any benefits. Your benefits will end unless the arrangements are made within the time allowed. Ask your Employer for the details on these arrangements.

**Our Home Office is located at One Madison Avenue, New York, New York 10010.**

Form G.23000-E

27

51

THIS PAGE IS INTENTIONALLY BLANK

# EARLY INTERVENTION PROGRAM FOR
## LONG TERM DISABILITY BENEFITS

The Early Intervention Program is a disability management program that involves the early identification of a potential Long Term Disability Candidate who may benefit from rehabilitative disability management. Its purpose is to enable a Long Term Disability Management Coordinator to work with the disabled person to complete vocational analyses and to develop disability management schedules during the optimal time for initiating rehabilitation attempts.

### A.    Definitions

"**Candidate**" means an Employee who is determined by us to be a potential claimant for Long Term Disability Benefits and eligible for participation in the Early Intervention Program.

"**Long Term Disability Management Coordinator**" (herein called Coordinator) means an individual who is employed by us to coordinate the Early Intervention Program.

"**Disability Management Benefits Schedule**" (herein called Schedule) means the specific schedule of benefits for rehabilitation services developed by the Coordinator for each Candidate.

"**Early Intervention Program**" (herein called Program) means the program established by us wherein we identify Employees, during their elimination period, who may benefit from a program of disability management with a rehabilitation goal.

52

**B.  How the Program Works**

### Early Warning Table

| | |
|---|---|
| Amputations | Back Problems |
| Burns (severe) | Carpal Tunnel Syndrome |
| Head Injuries | Chronic Fatigue Syndrome |
| Spinal Cord Injuries | Cardiovascular Conditions |
| Neurological Conditions | Muscle and Joint Injuries or |
| Severe Traumatic | Diseases |
| Injuries | Obesity or Eating Disorders |
| Vision or Hearing Loss | Osteomyelitis |
| Alcoholism or Substance | Psychiatric Conditions |
| Abuse | |

**1.  Notice**

A Coordinator must be notified in order for an Employee who has a disabling condition listed in the Early Warning Table to be considered as a potential Candidate for the Early Intervention Program.

If the Employee is determined by the Coordinator to be a potential Candidate, the Employer must complete the Employer portion of the Notice Of Claim form and then obtain the Employee's signed authorization before submitting the Notice Of Claim form to us.

**2.  Evaluation**

After receipt by us of the Notice Of Claim form, the Coordinator will:

a.  contact the Employee about the Early Intervention Program;

b.  obtain sufficient information to monitor the benefits for the Employee's current diagnosis and projected medical treatment, and also obtain vocational information; and

c.  determine whether the Employee is a Candidate for the Early Intervention Program.

**3.  Development**

The Coordinator will develop for each Candidate a proposed Disability Management Benefits Schedule that meets the guidelines of our Early Intervention Program.

**4.  Offer**

The proposed Disability Management Benefits Schedule will then be offered to the Candidate and the attending Doctor. The attending Doctor can recommend the Disability Management Benefits Schedule, and the Candidate can consent to obtaining the services contained in the Schedule. Under this Program, all treatment decisions are the responsibility of the Candidate and attending Doctor. We do not engage in the practice of medicine and are not responsible for the quality of services provided and for which benefits are listed in the Disability Management Benefits Schedule.

If the proposed Disability Management Benefits Schedule is recommended by the attending Doctor, and the services contained in the Schedule are consented to by the Candidate, we will pay for specific expenses for rehabilitation services, vocational services, and other approved medical services listed in the Schedule and for which benefits are not payable under any other plan that covers the Candidate (including, but not limited to, the Candidate's medical plan, automobile liability coverage, no-fault auto insurance, Workers' Compensation, or other state or federally sponsored programs).

**5.  Reevaluation**

While a Disability Management Benefits Schedule is in progress, the Coordinator will continue to monitor such Schedule. If it is deemed appropriate, the Coordinator, with the recommendation of the attending Doctor and consent of the Candidate for different services, will modify such Schedule.

We retain the right to terminate the Candidate's participation in the Early Intervention Program upon notice to the Candidate and the attending Doctor.

**You are not required to participate in the Early Intervention Program in order to be eligible for Long Term Disability Benefits.**

## CLAIMS INFORMATION

### Procedures for Presenting Claims for Benefits

All claim forms needed to file for benefits under the group insurance program can be obtained from your Employer who will also be ready to answer questions and to assist you or, if applicable, your Eligible Survivor in filing claims. The instructions on the claim form should be followed carefully. This will expedite the processing of the claim. Be sure all questions are answered fully.

The completed claim form should be returned to your Employer who will certify that you are insured under the Plan and will then forward the claim form to Metropolitan.

When the claim has been processed, you or, if applicable, your Eligible Survivor will be notified of the benefits paid. If any benefits have been denied, you or, if applicable, your Eligible Survivor will receive a written explanation.

### Routine Questions

If there is any question about a claim payment, an explanation may be requested from Metropolitan through your Employer or by direct contact with your Metropolitan Group Disability Claim Office.

### Requesting a Review of Claims Denied In Whole or In Part

In the event a claim has been denied in whole or in part, you or, if applicable, your Eligible Survivor can request a review of your claim by

Metropolitan. This request for review should be sent to Group Insurance Claims Review at the address of Metropolitan's office which processed the claim within 60 days after you or, if applicable, your Eligible Survivor received notice of denial of the claim. When requesting a review, please state the reason you or, if applicable, your Eligible Survivor believe the claim was improperly denied and submit any data, questions or comments you or, if applicable, your Eligible Survivor deems appropriate.

Metropolitan will re-evaluate all the information and you or, if applicable, your Eligible Survivor will be informed of the decision in a timely manner.

## CONTRIBUTIONS

You must make a contribution to the cost of Long Term Disability Benefits.

\* \* \* \*

## FUTURE OF THE PLAN

It is hoped that This Plan will be continued indefinitely, but State of California reserves the right to change or terminate This Plan in the future. Any such action would be taken only after careful consideration.

Best's Insurance Reports - Life Health, US, 2006 Edition (2005 Annual Data, Version 2006.1)
06704 - Metropolitan Life Insurance Company

Group Affiliation: Metropolitan Life and Affiliated Cos

# METROPOLITAN LIFE INSURANCE COMPANY

200 Park Avenue, New York, New York, United States 10166
Exec. Office: One MetLife Plaza, Long Island City, New York, United States 11101
Web: www.metlife.com

Tel: 212-579-2211
AMB#: 06704
FEIN#: 13-5581829

Fax: 212-578-7298
NAIC#: 65978

# BEST'S RATING

Based on our opinion of the consolidated Financial Strength of the life/health members of Metropolitan Life and Affiliated Companies, which operate under a group structure, this group member is assigned a Best's Rating of A+ (Superior). The company is assigned the Financial Size Category of Class XV which is the Financial Size Category of the parent.

# RATING RATIONALE

Rating Rationale: The rating of Metropolitan Life Insurance Company (MLIC) and its affiliates is based on the organization's well-established brand name, leading market positions in its core business lines, diverse sources of revenue and earnings, and strong liquidity position. The rating also reflects the overall balance of the organization provided by its, property/casualty, international, reinsurance and financial services subsidiaries. The recent acquisition of Travelers' domestic and international life operations provides the group with the increased distribution and scale necessary to remain an industry leader in its various product lines. The group continues to pursue its strategic focus on the life and annuity markets by expanding both its domestic and international market share through organic growth and strategic acquisitions as well as through on-going operational efficiencies. MLIC manages a diverse investment portfolio which traditionally produces solid contributions to earnings due to the elements contained within its investment portfolio. With the integration of Travelers, the Travelers investment portfolio was rebalanced to the group's standards. Offsetting these strengths is its strict capital management evidenced through its moderate risk adjusted capital position, the increased operating expenses due to the Travelers integration as well as its increased exposure to the international marketplace. In addition, A.M. Best believes MLIC and its affiliates will need to demonstrate its ability to reduce expense ratios and manage operating leverage to levels consistent with pre-acquisition levels, while enhancing profitability and improving return on equity. Lastly, A.M. Best will continue to monitor the group's ability to manage challenges associated with products that are interest rate sensitive as well as products that have equity market exposure.

The company has historically demonstrated strong operating earnings, sales and growth in assets under management. The rating also reflects the group's moderate financial leverage, financial flexibility, solid debt service capacity and a demonstrated ability to access the capital markets on a recurring basis after several years as a public company. In recent years, the group arranged its regulated entities under MetLife, Inc. from previous ownership by MLIC to increase the financial flexibility of its insurance entities, enhance its upstream dividend capacity to the parent holding company and generate a moderate level of statutory gains. With the integration of Travelers, A.M. Best expects MetLife will continue to pursue operating efficiencies and optimize the dividend capacity of its operating subsidiaries while meeting stringent compliance standards. MetLife has taken several steps toward enhancing its financial stability including improvement of asset/liability management practices, reduced allocation to the high-yield markets over the last several years, and the recent sale of several high profile properties. Furthermore, the company has centralized its accounting controls, financial framework initiatives, and continues to overhaul its reinsurance program as an effective way to mitigate risk. The integration of Travelers augmented MetLife's earnings power via increased scale, expanded distribution capabilities and enhanced its market positions in its core life and retirement savings businesses worldwide.

The Group's rapid growth and expansion through acquisitions has had a negative impact on its risk adjusted capital position as measured by A.M. Best. Management continues to pursue alternative methods to increase dividend capacity to its parent from its core operating subsidiaries while creating operational efficiencies. Despite its decline, A.M. Best remains concerned with the group's relatively high leverage position and will be monitoring this closely to ensure MetLife is able to manage this down as projected. A.M. Best will continue to monitor the rate of growth in its annuity product lines in conjunction with its overall level of risk adjusted capitalization, in addition to its ability to continue to manage challenges associated with products that have

Copyright © 2006, A.M. Best Company. All Rights Reserved.
Reproduction and distribution of A.M. Best data to third parties is strictly
prohibited without express written consent. Visit the A.M. Best website at
http://www.ambest.com for the latest Best's Ratings and Best's Company Reports.

# EXHIBIT B

Best's Insurance Reports - Life Health, US, 2006 Edition (2005 Annual Data, Version 2006.1)
06704 - Metropolitan Life Insurance Company

Page 2

equity market exposure and are interest rate sensitive.

**Best's Rating: A+ g**

**Outlook: Stable**

# RECENT DEVELOPMENTS

On July 1, 2005, MetLife, Inc. completed the acquisition of Citigroup's Travelers Insurance Company and Travelers Life & Annuity Co. and substantially all of Citigroup's international insurance businesses, which was purchased for approximately $11.8 billion in cash and stock. The transaction encompasses Travelers' U.S. business and its international operations other than Citigroup's life business in Mexico. International operations include joint ventures in Japan, Taiwan and China, and wholly-owned insurance businesses in Argentina, Australia, Belgium, Brazil, Poland and the U.K.

# FIVE YEAR RATING HISTORY

| Date | Best's Rating |
|---|---|
| 05/05/06 | A+ g |
| 07/01/05 | A+ g |
| 01/31/05 | A+ g |
| 03/31/04 | A+ g |
| 11/19/03 | A+ g |
| 06/23/03 | A+ g |
| 06/21/02 | A+ g |

# KEY FINANCIAL INDICATORS
## (in thousands of dollars)

| Year | Assets | Total Capital Capital Surplus Funds | Condit'l Reserve Funds | Net Premiums Written | Net Invest Income | Net Income |
|---|---|---|---|---|---|---|
| 2000 | 182,529,800 | 7,210,314 | 4,726,154 | 23,610,211 | 8,845,817 | 1,043,707 |
| 2001 | 185,581,726 | 5,370,716 | 3,657,018 | 20,021,427 | 9,042,837 | 2,777,749 |
| 2002 | 201,005,134 | 6,986,077 | 4,726,091 | 22,374,529 | 9,121,734 | 1,462,207 |
| 2003 | 229,125,886 | 7,977,898 | 3,883,471 | 24,854,636 | 8,837,361 | 2,168,733 |
| 2004 | 244,236,104 | 8,804,495 | 4,244,092 | 26,845,079 | 9,405,755 | 2,648,195 |
| 2005 | 250,355,681 | 8,639,302 | 4,049,136 | 26,335,305 | 9,878,570 | 2,155,045 |
| 03/2005 | 249,594,269 | 9,549,846 | 4,161,041 | 6,444,285 | 2,375,833 | 766,608 |
| 03/2006 | 267,454,611 | 9,342,671 | 3,606,351 | 6,957,692 | 2,474,908 | 436,365 |

# BUSINESS REVIEW

CORPORATE OVERVIEW - Metropolitan Life Insurance Company ( MLIC), now in its second century of operation, is part of the largest life insurance group in the nation with respect to total life insurance in force and total admitted assets. MLIC, together with its subsidiaries and affiliates, offers a comprehensive portfolio of individual and group life, annuities, pensions, group non-medical health insurance programs, and property and casualty coverage. These products are provided through the organization's five primary business segments reported on a GAAP basis: Institutional, Individual, Auto & Home, International and Reinsurance. MLIC operates in all fifty states, the District of Columbia, Puerto Rico, the U.S. Virgin Islands and Canada. The overall group has also established operations worldwide with direct writing access to over 35 countries. The group strengthened relationships in Brazil, China and Hong Kong and has refined its international strategy by focusing on emerging, high growth markets where it can achieve competitive returns. These international activities are now conducted predominantly

Copyright © 2006, A.M. Best Company. All Rights Reserved.
Reproduction and distribution of A.M. Best data to third parties is strictly
prohibited without express written consent. Visit the A.M. Best website at
http://www.ambest.com for the latest Best's Ratings and Best's Company Reports.

Best's Insurance Reports - Life Health, US, 2006 Edition (2005 Annual Data, Version 2006.1)
06704 - Metropolitan Life Insurance Company

Page 3

outside of the lead insurer's operations.

METS unique organization structure continues to evolve from mergers, acquisitions and consolidations evidenced by the recent consolidation of Paragon Life Insurance company into Metropolitan Life Insurance Company on May 1, 2006. A significant consolidation event occurred with the June 30, 2005 acquisition by MetLife, Inc. of the Travelers Life Insurance Company from Citigroup, adding increased scale in the annuity business and providing access to Citigroup's diverse distribution network. On January 31, 2005, MLIC sold its asset management business, SSRM Holdings, Inc. to a third party ending its activities in the Asset Management segment. On October 8, 2004, MetLife, Inc. completed another restack transaction whereby Metropolitan Insurance and Annuity Company and New England Pension and Annuity Company, an indirect subsidiary of MLIC, were merged into Metropolitan Tower Life, a subsidiary of MetLife, Inc. In January 2004, MetLife completed the sale of its operation in Spain, MetLife Iberia, S.A. and its subsidiaries, Seguros Genesis, S.A., and Genesis Seguros Generales, S.A., to Liberty Insurance Group, S.A., a Spanish subsidiary of Liberty Mutual Group. This transaction completed the group's exit from the slow growing insurance marketplace in Spain and Portugal.

In April 2000, Metropolitan Life Insurance Company completed the conversion from a mutual company, owned by its policyholders, to a publicly traded stock company via a full demutualization. The organization simultaneously raised $2.88 billion through an initial public offering of common stock in MetLife, Inc., a holding company created in connection with the reorganization. In addition, approximately $1.006 billion was raised through the issuance of trust preferred securities supported by subordinated debentures issued by MetLife, Inc. and MetLife Capital Trust I. This conversion benefited the company by providing enhanced organizational and financial flexibility associated with public ownership and direct access to the capital markets. In connection with the company's conversion to a stock company, the group aligned itself into the following business segments:

INSTITUTIONAL BUSINESS:

GROUP LIFE AND NON-MEDICAL HEALTH PRODUCTS - MLIC is the leading provider of group life insurance, non-medical health insurance products, including short and long-term disability, long term care and dental insurance and related administrative services, as well as employer-sponsored auto and homeowners insurance and prepaid legal service plans. Its group insurance products are marketed to small, medium and large companies, either as an integrated employee benefits package or as stand-alone product offerings.

Group life products are the leading products in the group insurance portfolio, where MLIC has been an industry leader for many years in terms of product innovation and customer service. The company has over $1.5 trillion in group life insurance in force, which represents an estimated one-fifth share of the U.S. market. The company markets group term, group universal life (GUL) and group variable universal life products (GVUL), accidental death and dismemberment and survivor benefits. MLIC was one of the first companies to offer GUL and GVUL products. Their National Accounts group includes companies with over 25,000 employees and has approximately 11 million covered lives, representing over one-third of the institutional segment revenues. MLIC has achieved organic growth in this area through offering broader coverage and by successfully deepening the relationships and writing additional business from these accounts. In recent years, the company has benefited from some large corporate-owned and bank-owned life insurance (COLI/BOLI) contracts The company has also established a Small Market Strategy to focus activities on the rapidly growing small case market, with products specifically designed and priced for this segment.

MLIC's group dental operation also has a significant market presence and is a leading provider of traditional and preferred provider dental plans, including voluntary (employee-pay-all) plan designs. The company has consistently expanded its provider network of dentists to its current level of approximately 80,000 dentists, a key competitive factor in the managed dental market. The group dental operation's lead product is its PPO, Preferred Dentist Program (PDP). The PDP is a point-of-service managed dental care plan that allows members access to the dentist of their choice, either in or outside of the MetLife provider network. This program is the largest national commercial dental preferred provider plan with over 20 million covered lives. The company has also enhanced their websites, metdental.com, for dentists and mybenefits.com, for employees.

MLIC provides other primary group non-medical health insurance offerings including long-term care and disability products. The company seeks to attain critical mass in higher-growth segments such as long-term care, and established John Hancock, the largest employer-sponsored long-term care program for United States government federal employees and their families. The company is also the largest short-term disability carrier in the industry and the second largest overall disability management provider. The disability business covers more than 8 million employees at 13,000 companies worldwide, with a wide range of short and long-term programs including employer-paid, contributory and voluntary programs on an administrative services only or fully insured basis.

Copyright © 2006, A.M. Best Company. All Rights Reserved.
Reproduction and distribution of A.M. Best data to third parties is strictly
prohibited without express written consent. Visit the A.M. Best website at
http://www.ambest.com for the latest Best's Ratings and Best's Company Reports.

Best's Insurance Reports - Life Health, US, 2006 Edition (2005 Annual Data, Version 2006.1)
06704 - Metropolitan Life Insurance Company

RETIREMENT AND SAVINGS PRODUCTS - Retirement and savings products include bundled administrative and investment services sold to sponsors of small and mid-sized 401(k) and other defined contribution plans. MLIC is also a major writer of general account and separate account group annuities. The company offers a variety of stable value products, such as guaranteed interest contracts (GICs) and separate account contracts for the investment of defined benefit and defined contribution assets. The company also offers alternative GICs, in a separate account structure (MetManaged GIC) The MetManaged GIC combines aspects of active asset management with some traditional features of guaranteed interest contracts. The company's stated plan is to sell retirement income products by leveraging its plan sponsor relationships to respond to the retirement needs of their employees. The Company has also issued approximately $10 billion of global GICs to foreign investors.

The acquisition of Travelers has expanded Retirement and Savings product presence in GICs, Global GICs, Funding Agreements, Payout Annuities and Structured Settlements. General Account assets, attributable to Retirement and Savings, will grow approximately 60% as a result of the acquisition.

INDIVIDUAL: The Group serves the middle-income, affluent and business owner markets with protection and asset accumulation products primarily through its agency and independent distribution groups. Products offered include traditional life, term, universal and variable life, qualified and non-qualified variable and fixed annuities, disability and long-term care insurance, as well as mutual funds.

The agency distribution groups include the Metropolitan Life Insurance Co. and New England Financial career and general agency systems. The independent distribution group includes MetLife Investors, GenAm, Walnut Street Securities and Tower Square Securities. In addition, MetLife Resources offers tax-sheltered annuities to educators, healthcare workers and government employees.

Approximately 12,000 full time agents and advisors sell products through these channels. The company has successfully stabilized its career agent field force through increased focus on training, recruitment and administrative support for its producers. These efforts have generated steadily increasing agent productivity and significantly improved agent retention. The segment is now focused on further improving agent productivity, profitable growth and creating a planning platform for all market segments.

The company has also broadened its distribution of individual life and annuities beyond the career agency force and now markets products through independent agents, financial institutions, independent broker/dealers and third party marketing organizations through a series of acquisitions and startups. In 1997, the group expanded its distribution capabilities with the purchase of Security First Group, Inc. In 2000, MLIC acquired General American Life Insurance Company and in 2001, the group created MetLife Investors. Most recently, MetLife, Inc. acquired Travelers Insurance Company and its principal company, Travelers Life and Annuity Company. Today, this unit sells products through over 100,000 registered representatives affiliated with other institutions. In 2004, independent distribution accounted for over 55% of annuity sales and the proportion is expected to grow significantly with the independent distribution arrangements that were part of the Travelers transaction. While A.M. Best expects the sales activities in these alternate distribution sources to continue to expand and generate an increasing proportion of overall sales, the company is still strongly committed to supporting and improving its core career agency system. The company has also started to utilize customer data to identify potential customers and aid in the process of lead generation for its field force. A.M. Best believes the success of these initiatives will be important to expand the revenue base and grow earnings in the individual business segment.

INTERNATIONAL: The group focuses on emerging insurance markets in Asia/Pacific, Latin America and selected European countries and has made several recent acquisitions to expand its global operations. Additional opportunities exist within late-stage, mid-stage and newly-emerging countries, where successful new ventures have been made in countries such as Mexico and Hong Kong. The group currently operates in approximately twelve countries with representative offices in the Czech Republic and China, with relatively new ventures established in India and Chile. The international strategy is to develop the businesses previously owned and those acquired from Citigroup with an objective of establishing a top-five ranking in each country.

In total, the Mexican and Chilean businesses generate a substantial amount of premium volume for its Latin American operations, representing approximately four-fifths of total sales. In November 2001, MetLife, Inc. entered the Chilean market by acquiring two wholly-owned subsidiaries of Santander Central Hispano. In June 2002, MetLife, Inc. completed its acquisition of Aseguradora Hidalgo, S.A. (Hidalgo), Mexico's largest life insurer, for approximately $950 million or 9.2 billion Mexican pesos. MET had operated in Mexico for over ten years prior to the Hidalgo acquisition, and has an estimated market share of 7% in the Mexican life market. The group gained valuable size through Hidalgo's group and individual life insurance operations, with estimated market share of 34% and 23%, respectively. Hidalgo is the primary provider of group insurance and

Copyright © 2005, A.M. Best Company. All Rights Reserved.
Reproduction and distribution of A.M. Best data to third parties is strictly
prohibited without express written consent. Visit the A.M. Best website at
http://www.ambest.com for the latest Best's Ratings and Best's Company Reports.

Best's Insurance Reports - Life Health, US, 2006 Edition (2005 Annual Data, Version 2006.1)
06704 - Metropolitan Life Insurance Company

Page 5

individual products through worksite marketing to government employees, which is estimated to represent 800,000 of the company's approximately 2.8 million covered lives. Although this contract expired in 2004, the corresponding earnings from this Federal Group Life contract comprise only about one-tenth of this entity's operating earnings. The integration of Hidalgo, which has become a wholly-owned subsidiary of MetLife, Inc., took over one year to fully integrate into the MetLife profile due to the cost synergies, retention of the Hidalgo name, ongoing revenue enhancement opportunities with quasi-government groups and a prospective expansion into the private employer market through worksite marketing.

REINSURANCE: The group's reinsurance operations consist of MetLife, Inc.'s majority ownership of publicly traded life reinsurer Reinsurance Group of America, Incorporated (RGA Inc.) and its wholly-owned life reinsurance subsidiary, RGA Reinsurance Company (RGA). Although the vast majority of RGA's premiums come from the United States, its operations are globally diverse. RGA also provides asset-based reinsurance and financial reinsurance, with a substantial amount of total life reinsurance in-force. MLIC acquired and maintains an approximate 52% ownership of RGA through its acquisition of GenAmerica Financial Corporation on January 6, 2000, and the aggregate stake includes the previously purchased 4.8 million common shares through a private placement offering. Following RGA Inc.'s issuance of Preferred Income Redeemable Securities (PIERS) in December 2001, the Company announced its intent to purchase up to $125 million in additional shares in the public company to offset any potential dilution of its holdings caused by RGA Inc.'s future exercise of the PIERS. MetLife is developing a reinsurance strategy to overhaul the current reinsurance program. Currently the reinsurance program consists of individual transactions with companies in the individual life segment.

CLOSED BLOCK: In connection with the company's conversion to a public stock company, MLIC established a closed block book of business for the benefit of individual participating policyholders, who receive ongoing dividend payments as part of their respective policies. With approval from New York regulators, the Company constructed the closed block and designated sufficient assets that, along with insurance policy premiums, would generate cash flows to support all future benefit and reasonable dividend payments. These cash flows are expected to be sufficient to pay each policyholder, including the last surviving individual, a commensurate amount of cash flow for policyholder benefits and dividends such that the assets and liabilities run out together over time. These results are reported separately on a GAAP basis. Participating policies represent approximately one-fifth of MLIC's life insurance in-force and approximately three-quarters of the total number of life insurance policies in-force (net of reinsurance). While the company may change its policyholder dividends, A.M. Best expects them to be consistent with the historical trend of prior dividend payments.

In 2000 and 2001, the company entered into various reinsurance arrangements related to its closed block policies with unaffiliated third parties for approximately $32 billion in life insurance reserves under modified coinsurance arrangements. These 10-year contracts effectively ceded 90% of the risk underlying these insurance contracts, with the company retaining approximately 10% of this risk. A.M. Best views favorably the group's control over the investment policy related to these contracts and recognizes the significant amount of risk-based capital relief the company obtains from a regulatory perspective for ceding the underlying asset, insurance, interest rate and reserve risk.

## PREMIUM AND RESERVE ANALYSIS

| Direct Premiums (000) | 2005 | 2004 | 2003 | 2002 | 2001 |
|---|---|---|---|---|---|
| Industrial life | 52,129 | 52,725 | 53,082 | 58,426 | 64,228 |
| Ordinary life | 4,787,007 | 4,782,824 | 4,835,783 | 4,942,527 | 5,002,297 |
| Group life | 6,991,724 | 6,481,489 | 6,057,621 | 6,401,825 | 6,874,266 |
| Individual annuities | 3,052,284 | 2,846,970 | 2,853,919 | 2,547,756 | 2,292,470 |
| Group annuities | 9,916,893 | 7,908,331 | 7,258,180 | 7,461,406 | 7,711,993 |
| Individual A&H | 419,620 | 311,759 | 228,231 | 192,721 | 162,277 |
| Group A&H | 3,647,456 | 3,238,835 | 2,690,013 | 2,554,055 | 2,311,910 |
| Other | -6 | -5 | ... | ... | ... |
| Total | 28,867,107 | 25,622,928 | 23,976,829 | 24,158,717 | 24,419,445 |

Copyright © 2006, A.M. Best Company. All Rights Reserved.
Reproduction and distribution of A.M. Best data to third parties is strictly
prohibited without express written consent. Visit the A.M. Best website at
http://www.ambest.com for the latest Best's Ratings and Best's Company Reports.

Best's Insurance Reports - Life Health, US, 2006 Edition (2005 Annual Data, Version 2006.1)
06704 - Metropolitan Life Insurance Company                                                        Page 6

| Reins Assumed Prems (000) | 2005 | 2004 | 2003 | 2002 | 2001 |
|---|---|---|---|---|---|
| Ordinary life | 6,457 | 29,838 | 38,076 | 37,595 | 45,953 |
| Group life | 459,375 | 395,131 | 359,691 | 273,195 | 238,073 |
| Individual annuities | 439,765 | 5,201,499 | 5,045,225 | 2,580,660 | 1,027,490 |
| Group annuities | 255 | 1,077 | 377 | 0 | 6,949 |
| Individual A&H | 131,073 | 111,835 | 74,763 | 81,787 | 87,082 |
| Group A&H | 5,688 | 6,161 | 7,319 | 20,238 | 46,351 |
| Other | ... | 98,718 | 52,938 | 166,775 | ... |
| Total | 1,042,613 | 5,844,259 | 5,578,388 | 3,160,250 | 1,451,898 |

| Reins Ceded Prems (000) | 2005 | 2004 | 2003 | 2002 | 2001 |
|---|---|---|---|---|---|
| Ordinary life | 676,410 | 674,129 | 568,697 | 526,463 | 4,681,764 |
| Group life | 1,015,722 | 993,305 | 1,030,506 | 1,049,816 | 990,688 |
| Individual annuities | 13,411 | 5,016 | ... | ... | ... |
| Group annuities | 459 | 487 | 825 | 1,060 | 937 |
| Individual A&H | 75,759 | 79,235 | 80,636 | 87,510 | 90,874 |
| Group A&H | 58,388 | 71,234 | 62,911 | 66,877 | 85,652 |
| Other | 1,734,266 | 2,798,702 | 2,957,005 | 3,212,712 | ... |
| Total | 3,574,414 | 4,622,108 | 4,700,580 | 4,944,437 | 5,849,916 |

| Net Premiums & Deposits (000) | 2005 | 2004 | 2003 | 2002 | 2001 |
|---|---|---|---|---|---|
| Industrial life | 52,129 | 52,725 | 53,082 | 58,426 | 64,228 |
| Ordinary life | 4,145,204 | 4,169,214 | 4,340,172 | 4,492,200 | 735,749 |
| Group life | 6,435,377 | 5,883,315 | 5,386,806 | 5,625,205 | 6,121,651 |
| Individual annuities | 9,400,074 | 13,588,393 | 13,148,699 | 10,085,493 | 8,215,619 |
| Group annuities | 14,379,461 | 12,896,591 | 12,615,046 | 10,238,334 | 9,470,158 |
| Individual A&H | 474,933 | 344,358 | 222,357 | 186,998 | 158,485 |
| Group A&H | 3,594,755 | 3,173,762 | 2,634,421 | 2,507,416 | 2,272,613 |
| Other | -1,734,272 | -2,699,989 | -2,904,067 | -3,045,937 | ... |
| Total | 36,747,662 | 37,408,370 | 35,496,516 | 30,148,135 | 27,038,503 |
| Deposits (incl. above) | 10,412,356 | 10,563,290 | 10,641,880 | 7,773,606 | 7,017,076 |

General Account

| Reserve Distribution (000) | 2005 | 2004 | 2003 | 2002 | 2001 |
|---|---|---|---|---|---|
| Industrial life | 2,299,211 | 2,350,585 | 2,400,309 | 2,444,691 | 2,485,213 |
| Ordinary life | 44,917,093 | 43,753,821 | 43,277,744 | 42,371,238 | 41,208,302 |
| Group life | 5,631,300 | 5,470,858 | 5,332,679 | 5,189,911 | 4,901,053 |
| Supplementary contracts | 802,653 | 769,104 | 737,562 | 739,936 | 705,092 |
| Individual annuities | 18,428,223 | 18,333,996 | 17,076,904 | 15,806,291 | 14,016,349 |
| Group annuities | 35,857,958 | 34,237,855 | 32,805,782 | 32,070,023 | 30,175,202 |
| Deposit type contracts | 28,093,922 | 24,669,611 | 20,097,054 | 14,587,170 | 13,715,154 |
| Individual A&H | 1,842,609 | 1,423,628 | 1,019,342 | 962,696 | 888,314 |
| Group A&H | 4,289,222 | 3,786,870 | 3,536,865 | 3,227,906 | 3,004,672 |
| Total | 142,162,192 | 134,796,328 | 126,284,241 | 117,399,862 | 111,099,352 |

**Current Year Geographic Direct Premium Distribution ($000):** New York, $7,591,697 (22.9%); California, $2,487,075 (7.5%); Illinois, $1,550,185 (4.7%); New Jersey, $1,504,646 (4.5%); Texas, $1,393,999 (4.2%); other jurisdictions,

Copyright © 2006, A.M. Best Company. All Rights Reserved.
Reproduction and distribution of A.M. Best data to third parties is strictly
prohibited without express written consent. Visit the A.M. Best website at
http://www.ambest.com for the latest Best's Ratings and Best's Company Reports.

$18,582,532 (56.1%).

# EARNINGS

MLIC's statutory earnings have generally improved on a historical basis, with particular improvement seen in the recent years as a result of strengthening in its group annuities business. The operating fundamentals of the company's core businesses have improved over the past five years as additional costs have been removed from its higher-than-average expense infrastructure, providing a strong platform for future profitable growth. The company has implemented a series of initiatives in its individual business segment (individual life and annuities) that have generated productivity enhancements, and vastly improved agent retention. The company has also strategically expanded its presence in the institutional pension arena, through organic growth and strategic acquisitions, both domestically and internationally. As a result of these efforts, the company's reported premium income and operating earnings have generally increased along with consistent positive trends in its asset base, with somewhat unfavorable trends in its separate account asset in recent years due to the volatile equity market conditions and low interest rates that hampered annuity sales.

Historical statutory results by line of business have fluctuated due to a number of factors, including: costs and proceeds associated with the sale of various non-core operations; adverse claims experience in its disability business; expenses related to its demutualization; costs, including severance, associated with restructuring certain operations; and the impact of declining interest rates and problem mortgage and real estate-related investments on its interest sensitive and guaranteed interest contract (GIC) businesses. The company's historical results as a mutual company were also adversely impacted by significant reserving for sales practice claims. Despite the frequency and size of these single-event items, the company has experienced overall improvements in its statutory results due to improved operating fundamentals, particularly with respect to its individual life line of business. The group has produced favorable results overall, offset somewhat by its individual and group annuity segments which have exhibited some volatility in annual sales and performance. The company has also benefited from strong and consistent group life results that reflect favorable mortality experience, strong sales of group term and group variable/universal life product, as well as very strong persistency on existing business. Overall, group life operations have generated between one-quarter and two-thirds of the company's total pre-tax statutory net operating gain over the past five years.

On a GAAP basis, the Group's operating performance in recent years measured in terms of overall profitability, return on assets and return on equity, has also improved steadily. While consolidated operating earnings have improved significantly since demutualization, the group's net income has been somewhat volatile. This is partly due to one-time costs associated with its demutualization including payments to former Canadian policyholders, exiting of certain businesses, and restructuring initiatives. Most recently, the parent company has had to take a number of one-time charges related to prospective settlement of certain actions, including race-conscious underwriting, asbestos, sales practice claims and General American's Medicare administration, which have negatively impacted earnings. MetLife, Inc. also took a $325 million pre-tax charge ($208 million after tax) related to potential claims arising from the September 11 terrorist attacks.

In recent years the group instituted a more disciplined approach to pricing new sales and renewals of its disability products, resulting in improved profitability from 2002 forward offsetting some declines recognized in the late 1990's to early 2000's.

Other recent trends in operating earnings had illustrated declining results related to asset management which was caused primarily by the unfavorable equity markets. Offsetting this trend is improving results in its international group which is attributed to their expansion in emerging markets. The continued success of its restructuring initiatives in the career agency system and renewed revenue growth in its institutional lines have proven to be critical to the company's ability to close the expense gaps associated with its relatively high fixed cost structure, and have strengthened its earning capacity on both a statutory and GAAP basis. Overall, A.M. Best believes the Group's results should continue to show improvements in profitability given the initiatives completed thus far and those underway, in order to achieve the levels of productivity necessary to place the company among the most efficient life insurers. MetLife, Inc. is well-positioned to compete effectively against other insurance focused financial services companies, and expects to see ongoing growth and performance improvements.

## PROFITABILITY TESTS

Copyright © 2006, A.M. Best Company. All Rights Reserved.
Reproduction and distribution of A.M. Best data to third parties is strictly
prohibited without express written consent. Visit the A.M. Best website at
http://www.ambest.com for the latest Best's Ratings and Best's Company Reports.

Best's Insurance Reports - Life Health, US, 2006 Edition (2005 Annual Data, Version 2006.1)
06704 - Metropolitan Life Insurance Company                                                                    Page 8

| Year | Ben Paid to NPW & Dep | Comm & Exp to NPW & Dep | NOG to Tot Assets | NOG to Tot Rev | Operating Return on Equity | Net Yield | Total Return |
|------|------|------|------|------|------|------|------|
| 2001 | 92.1 | 10.1 | 0.5 | 2.9 | 14.1 | 7.37 | 8.78 |
| 2002 | 69.5 | 8.4 | 1.0 | 6.2 | 31.6 | 6.72 | 6.14 |
| 2003 | 58.5 | 8.5 | 0.7 | 4.4 | 20.0 | 5.77 | 6.32 |
| 2004 | 58.8 | 9.0 | 1.1 | 7.0 | 30.2 | 5.62 | 5.89 |
| 2005 | 65.9 | 8.8 | 0.5 | 3.8 | 15.4 | 5.69 | 6.44 |
| 03/2005 | 93.8 | 11.1 | 0.2 | 6.6 | 6.2 | 1.32 | 1.39 |
| 03/2006 | 96.7 | 11.4 | 0.2 | 4.9 | 5.0 | 1.33 | 1.33 |

## PROFITABILITY ANALYSIS

| Net Operating Gain (000) | 2005 | 2004 | 2003 | 2002 | 2001 |
|------|------|------|------|------|------|
| Industrial life | 22,976 | 16,818 | 21,005 | 25,466 | 128,987 |
| Ordinary life | -243,283 | 130,423 | 95,135 | 232,528 | 405,825 |
| Group life | 167,340 | 238,530 | 182,192 | 164,639 | 251,582 |
| Supplementary contracts | 163,244 | 127,714 | 124,442 | 83,871 | 76,508 |
| Individual annuities | 31,630 | 534,048 | -14,361 | 15,997 | 105,107 |
| Group annuities | 470,464 | 602,984 | 391,613 | 486,666 | -5,623 |
| Individual A&H | -63,135 | -21,772 | -3,438 | 12,311 | -15,187 |
| Group A&H | 130,571 | 176,756 | 145,326 | 157,233 | -59,079 |
| Other | 661,787 | 729,493 | 553,395 | 770,663 | 147 |
| Total | 1,341,594 | 2,534,992 | 1,495,309 | 1,949,374 | 888,268 |

## ACCIDENT & HEALTH STATISTICS

| Year | Net Premiums Written | Net Premiums Earned | Loss Ratio | Exp. Ratio | Underwriting Results |
|------|------|------|------|------|------|
| 2001 | 2,298,588 | 2,409,579 | 90.6 | 26.3 | -387,686 |
| 2002 | 2,690,482 | 2,689,015 | 84.7 | 21.8 | -154,385 |
| 2003 | 2,873,974 | 2,855,757 | 87.3 | 22.0 | -116,684 |
| 2004 | 3,561,615 | 3,505,318 | 84.2 | 23.8 | -172,687 |
| 2005 | 4,110,477 | 4,078,792 | 78.1 | 21.7 | -344,052 |
| **Current Year Experience:** | | | | | |
| Group | 3,551,745 | 3,594,380 | 77.4 | 17.8 | -167,995 |
| Collectively renew | 6 | 6 | 170.0 | 2.3 | -4 |
| Non-can | 169,617 | 166,858 | 78.3 | 48.6 | -46,084 |
| Guaranteed renew | 386,665 | 315,535 | 85.7 | 45.1 | -129,302 |
| Non-renew, S.R. | 2,262 | 1,837 | 49.7 | 76.7 | -812 |
| Other accident | 12 | 12 | 120.2 | 2.2 | -3 |
| Other | 170 | 165 | 5.7 | 3.8 | 149 |

## CAPITALIZATION

The MetLife Group has maintained moderate amounts of financial leverage and good financial flexibility that compare

Copyright © 2006, A.M. Best Company. All Rights Reserved.
Reproduction and distribution of A.M. Best data to third parties is strictly
prohibited without express written consent. Visit the A.M. Best website at
http://www.ambest.com for the latest Best's Ratings and Best's Company Reports.

Best's Insurance Reports - Life Health, US, 2006 Edition (2005 Annual Data, Version 2006.1)
05764 - Metropolitan Life Insurance Company

Page 9

favorably to its similarly rated peers. During 2005, due to the TL&A acquisition, MetLife increased its financial leverage to roughly 30% -- attributing some equity credit for hybrid securities. A.M. Best expects this level to moderate back to management's 25% target by early 2007.

In recent years, MLIC increased its capital and surplus by limiting dividends to the holding company, issuing capital notes and selling certain higher-risk assets including real estate. These efforts follow the company's aggressive management of its capital in recent years, which resulted in weakened risk adjusted-capitalization caused by approximately $721 million in ordinary dividends paid to the parent, along with approximately $3.1 billion in additional extraordinary dividends, which received approval for payment from New York regulators. MetLife was permitted to pay these dividends after completing intercompany sales of certain undervalued real estate properties at fair market value to Metropolitan Insurance and Annuity Company, a former subsidiary of MetLife. Based upon these dividends, capital and surplus fell by over $2.0 billion, with only a modest benefit derived from adopting codification in 2001. Prior to 2001, the company's capital base had remained virtually unchanged over the prior four years based upon consistent and strong investment income, tempered by fluctuations in operating performance, varying levels of both realized and unrealized capital gains and losses and consistent policyholder dividend payments.

MetLife continues to refine its organizational structure by implementing restacking initiatives to increase the financial flexibility of several of its insurance entities, enhance their upstream dividend capacity to the parent holding company, eliminate non-core, redundant entities and generate a moderate level of statutory gains. Additionally, in 2006 Paragon Life has merged into MLIC. In recent years, Security Equity Life Insurance Company and MetLife Security Insurance Company of Louisiana merged into the parent MetLife, Inc. A.M. Best considers the risk-adjusted capital position of the MetLife group, inclusive of all life insurance entities on a consolidated basis, to measure commensurately with other superior rated companies, attention is also placed on the appropriate level of risk-adjusted capital in each individual subsidiary. However, the collective actions taken by management reinforce MetLife's diverse and substantial financial resources, with a significant amount of available funds remaining at the parent company and within the MetLife organization, albeit outside the insurance company's control.

As a mutual company, MetLife traditionally added to its capital base through the issuance of surplus notes with $700 million issued in 1993 and another $700 million in 1995. Currently, MetLife has approximately $699 million in total surplus notes, following the call and redemption of $700 million in surplus notes in 2003. The remaining outstanding notes also include $148 million issued by New England Life Insurance Co. and $100 million issued by General American Life (GenAm), both of which were assumed by MetLife at the time of their respective company acquisitions. MetLife financed the acquisition of GenAm, as well as the stabilization program to provide liquidity to satisfy GenAm's institutional funding agreement contracts, mainly through the issuance of commercial paper. A.M. Best notes that MetLife currently retains capacity under MetLife Funding's commercial paper program, strong liquidity within its invested asset portfolio, multiple sources of external financing availability and additional liquidity through MetLife's committed credit facilities, providing adequate capacity to satisfy the ongoing liquidity needs of the enterprise.

## LEVERAGE TESTS

| Year | C&S to Liabilities | Surplus Relief | Reins Leverage | NPW & Dep to Capital | Change in NPW & Dep | Change in Capital |
|------|------|------|------|------|------|------|
| 2001 | 7.1 | 9.2 | 76.0 | 3.0 | 14.5 | -24.4 |
| 2002 | 7.0 | 7.6 | 48.6 | 2.6 | 11.5 | 29.7 |
| 2003 | 6.3 | 5.4 | 42.9 | 3.0 | 17.7 | 1.3 |
| 2004 | 6.8 | 5.9 | 39.1 | 2.9 | 5.4 | 10.0 |
| 2005 | 6.5 | 4.9 | 50.8 | 2.9 | -1.8 | -2.8 |
| | | | | | | |
| 03/2005 | 6.9 | 1.1 | XX | 0.5 | -14.3 | 5.1 |
| 03/2006 | 6.3 | 1.0 | XX | 0.5 | 8.0 | 2.1 |

2005 BCAR: 129

## SOURCES OF CAPITAL GROWTH
### (in thousands of dollars)

Copyright © 2006, A.M. Best Company. All Rights Reserved.
Reproduction and distribution of A.M. Best data to third parties is strictly
prohibited without express written consent. Visit the A.M. Best website at
http://www.ambest.com for the latest Best's Ratings and Best's Company Reports.

Best's Insurance Reports - Life Health, US, 2006 Edition (2005 Annual Data, Version 2006.1)
06704 - Metropolitan Life Insurance Company

| Year | Net Gain | Realized Capital Gains | Unrealized Capital Gains | Change AVR | Other Changes | Change in C&S |
|------|----------|------------------------|--------------------------|------------|---------------|---------------|
| 2001 | 888,268 | 1,889,481 | -103,203 | -535,048 | -3,979,097 | -1,839,598 |
| 2002 | 1,949,374 | -487,167 | -308,992 | 553,490 | -91,344 | 1,615,361 |
| 2003 | 1,495,309 | 673,424 | 191,255 | 635,161 | -2,003,329 | 991,821 |
| 2004 | 2,534,992 | 113,203 | 281,920 | -518,222 | -1,585,295 | 826,597 |
| 2005 | 1,341,594 | 813,451 | 510,852 | 177,454 | -3,008,545 | -165,193 |
| 03/2005 | 570,403 | 196,206 | -69,007 | XX | XX | XX |
| 03/2006 | 449,518 | -13,153 | 18,822 | XX | XX | XX |

## CAPITAL TRENDS
### (in thousands of dollars)

| Year | Year end C&S | Surplus Notes | Stock-holder Divs | Policy-holder Divs | Asset Valuation Reserve | Interest Maintenance Reserve |
|------|--------------|---------------|-------------------|--------------------|--------------------------|------------------------------|
| 2001 | 5,370,716 | 1,547,665 | 3,753,786 | 661,032 | 3,657,018 | 330,308 |
| 2002 | 6,986,077 | 1,547,704 | 903,900 | 208,550 | 4,726,091 | 724,609 |
| 2003 | 7,977,898 | 847,830 | 1,448,100 | 296,111 | 3,883,471 | 783,823 |
| 2004 | 8,804,495 | 847,830 | 797,000 | 265,433 | 4,244,092 | 836,872 |
| 2005 | 8,639,302 | 1,397,830 | 3,200,000 | 179,987 | 4,049,136 | 560,151 |
| 03/2005 | 9,549,846 | XX | ... | 52,295 | 4,161,041 | 793,468 |
| 03/2006 | 9,342,671 | XX | ... | 1,630 | 3,606,351 | 442,361 |

# INVESTMENTS AND LIQUIDITY

MLIC's admitted assets are well-diversified and its overall liquidity position is strong. In addition to quality, diversification and optimizing risk adjusted investment income and risk adjusted total return, the Group's investment philosophy requires that a reasonable match exists between the option adjusted characteristics of its assets and cash flow needs of its insurance and investment products. Historically, bonds and mortgage loans have comprised approximately four-fifths of consolidated invested assets, with real estate, policy loans, equity holdings, cash and short-term investments and other assets, including limited partnership interests, comprising the remaining classes. In recent years, the company had shifted more assets from its real estate holdings, common stock and policy loans into bonds, mortgage loans and cash and short-term investments. Fixed-income investments are diversified among publicly traded and privately placed corporate bonds, U.S. Government and municipals, foreign bonds, commercial and residential mortgage-backed securities (MBS) and asset-backed securities (ABS). The company is a significant participant in the private placement bond market, which increased as a percentage of MLIC's portfolio and represents approximately one-fifth of its bond investments. A.M. Best believes these are appropriate investments due to the relatively stable individual life insurance liabilities and the scale of its investment operations. Both the public and private corporate portfolios are highly diversified by economic sector and issuer, with investments typically spread among the industrial, utility and financial sectors. The company has maintained a high quality bond portfolio with over 90% rated investment grade. Met has reversed the buildup in high yield corporate securities as the risk adjusted total return no longer seemed attractive.

Like many of its competitors, MetLife maintains a manageable exposure to mortgage backed securities (MBS) which, despite their relatively high credit quality, can present a higher degree of interest rate risk and cash flow volatility. Historically, MBS have represented approximately one-fifth of the company's consolidated fixed maturities. A majority of the company's MBS portfolio is collateralized mortgage obligations (CMOs), which generally have more stable cash flows. MetLife's conservative asset/liability management practices match MBS with liabilities that have similar durations as well as interest rate and cash flow risks.

Copyright © 2006, A.M. Best Company. All Rights Reserved.
Reproduction and distribution of A.M. Best data to third parties is strictly
prohibited without express written consent. Visit the A.M. Best website at
http://www.ambest.com for the latest Best's Ratings and Best's Company Reports.

MetLife maintains a diversified portfolio of mortgage and equity investments. Mortgage holdings are well diversified by asset type with exposure to both commercial and agricultural loans. Commercial and agricultural loans are distributed geographically and by type of end-use with commercial mortgage exposure to loans made on office, retail, industrial and apartment properties. The company's diverse mortgage holdings generate substantial cash flows, and the portfolio is conservatively managed. MetLife's portfolio diversification in real estate equity and commercial mortgage and agricultural loans was a source of portfolio strength during the recent credit cycle downturn.

MetLife continues to maintain an above-average exposure to real estate related investments, although this exposure has been significantly reduced in recent years on an absolute basis and as a percentage of capital and surplus. As part of the company's plan to gradually reduce its exposure to equity real estate since 1992, sales have occurred on a number of properties, which have generated solid gains, reflecting the generally favorable real estate market conditions. Further, in 2001 the company affected an intercompany sale of two undervalued real estate properties between MLIC and Metropolitan Insurance and Annuity Company (MIAC), which resulted in approximately $1.5 billion in realized capital gains for MetLife and gains on common stock of affiliates totaling $800 million. On a GAAP basis, these transactions were eliminated upon consolidation. The company also sold selected various targeted real estate properties in 2002 and reaped material capital gains from these undervalued assets, further evidence of the company's deep financial flexibility. In 2003, MetLife continued to evaluate its real estate portfolio and is embarking on a new strategy to invest in smaller commercial and residential properties, which will increase portfolio diversification and allow greater diversification and opportunistic selling of properties, thereby creating higher returns. It subsequently sold 11 Madison Avenue, California Plaza and other select properties for a material net gain. Additionally, in 2004, the most significant sale was the Sears Tower in Chicago, which delivered an after tax gain of approximately $90 million. In 2005, as part of the Travelers acquisition funding plan, and reflecting the strong NYC market, the company sold 200 Park Avenue and One Madison Avenue, its former iconic headquarters realizing after tax capital gains of $750 million and $420 million respectively.

Derivatives contracts, such as futures, swaps, caps, floors and options, are utilized to hedge or reduce risks associated with its invested assets, liabilities, portfolios of assets or liabilities or anticipated transactions. In addition, the company enters into replication derivative transactions. Given the strong asset/liability management practices of the company, A.M. Best believes that the company appropriately manages its exposure in this area. MLIC's notional amount of derivatives contracts outstanding is modest relative to its asset base.

MLIC has generated overall strong and consistent investment income and yields from its asset portfolio. The investment yield has been somewhat tempered by the lower interest rate environment impacting the yield of new and reinvested cash. With an improving economic climate, realized investment losses significantly declined. The company's unrealized loss position decreased during the same time period and the current balance represents primarily market driven losses rather than credit or economic losses. The anticipation of higher rates has caused MetLife to begin repositioning its various bond portfolios generating somewhat higher levels of realized losses that are anticipated to be offset by redeployment at higher rates. A.M. Best notes the Group's ability to generate significant and consistent investment returns in spite of fluctuating market conditions reflects favorably on the company's investment management expertise and quality and depth of its portfolio.

## LIQUIDITY TESTS

| Year | Operating Cash Flow ($000) | Quick Liquidity | Current Liquidity | Non-Inv Grade Bonds to Capital | Delnq & Foreclsd Mtg to Capital | Mtg & Cred Ten Lns & RE to Cap | Affil Invest to Capital |
|------|------|------|------|------|------|------|------|
| 2001 | 9,939,624 | 39.5 | 49.6 | 100.8 | 0.9 | 315.7 | 82.4 |
| 2002 | 17,317,999 | 43.5 | 52.6 | 92.8 | 0.2 | 248.6 | 79.3 |
| 2003 | 17,209,861 | 45.1 | 54.2 | 86.9 | 0.3 | 248.1 | 124.3 |
| 2004 | 7,818,064 | 43.9 | 55.1 | 69.4 | 0.3 | 255.3 | 124.8 |
| 2005 | 1,306,233 | 41.5 | 50.7 | 74.9 | 0.2 | 276.2 | 110.9 |
| | | | | | | | |
| 03/2005 | 6,151,031 | XX | XX | 67.9 | 0.2 | 237.4 | XX |
| 03/2006 | 14,261,401 | XX | XX | 78.5 | 0.3 | 272.7 | XX |

## INVESTMENT YIELDS

Copyright © 2006, A.M. Best Company. All Rights Reserved.
Reproduction and distribution of A.M. Best data to third parties is strictly
prohibited without express written consent. Visit the A.M. Best website at
http://www.ambest.com for the latest Best's Ratings and Best's Company Reports.

Best's Insurance Reports - Life Health, US, 2006 Edition (2005 Annual Data, Version 2006.1)
06704 - Metropolitan Life Insurance Company

Page 12

| Year | Net Yield | Bonds | Stocks | Mort-gages | Cash & Short Term | Real Estate Gross | Real Estate Net | Invest. Exp. Ratio |
|------|-----------|-------|--------|------------|-------------------|-------------------|------------------|--------------------|
| 2001 | 7.37 | 7.53 | 2.78 | 7.86 | 5.24 | 22.07 | 8.48 | 11.36 |
| 2002 | 6.72 | 7.06 | 4.45 | 7.62 | 4.57 | 20.86 | 9.46 | 11.35 |
| 2003 | 5.77 | 5.90 | 1.39 | 7.38 | 3.61 | 18.50 | 9.03 | 10.65 |
| 2004 | 5.62 | 5.57 | 2.22 | 7.16 | 1.94 | 17.41 | 8.21 | 9.47 |
| 2005 | 5.69 | 5.90 | 3.51 | 6.99 | 4.34 | 16.08 | 7.83 | 12.69 |

## INVESTMENT DATA

Current Year Distribution of Bonds By Maturity

| | 0-1 | 1-5 | 5-10 | 10-20 | 20- | Yrs-Avg Maturity |
|------|-----|-----|------|-------|-----|------------------|
| Government | 0.6 | 3.0 | 4.1 | 1.1 | 3.6 | 12 |
| Gov't Agencies & Muni | 1.1 | 2.9 | 2.7 | 6.2 | 7.3 | 15 |
| Public Utilities | 0.4 | 1.1 | 1.0 | 0.9 | 2.0 | 14 |
| Industrial & Misc | 5.7 | 17.9 | 17.0 | 5.2 | 9.3 | 9 |
| Affiliated | 0.4 | 0.3 | 0.4 | ... | 5.8 | 22 |
| Total | 8.2 | 25.2 | 25.2 | 13.4 | 28.0 | 12 |

| | 2005 | 2004 | 2003 | 2002 | 2001 |
|------|------|------|------|------|------|
| Bonds (000) | 124,181,675 | 126,185,373 | 121,526,988 | 104,314,151 | 83,669,715 |
| US Government | 10.6 | 7.9 | 9.0 | 14.1 | 11.7 |
| Foreign Government | 1.8 | 1.8 | 2.0 | 2.2 | 2.6 |
| Foreign - All Other | 10.7 | 10.4 | 8.9 | 9.9 | 12.2 |
| State/Special Revenue - US | 20.0 | 19.3 | 21.9 | 16.7 | 15.7 |
| Public Utilities - US | 5.1 | 5.5 | 5.7 | 4.2 | 5.4 |
| Industrial & Misc - US | 44.7 | 46.8 | 45.5 | 48.1 | 48.5 |
| Credit Tenant Lns - US | ... | 0.3 | 0.4 | 0.5 | 0.5 |
| Affiliated | 7.0 | 8.0 | 6.6 | 4.3 | 3.3 |
| Private Issues | 15.4 | 19.5 | 14.1 | 16.1 | 19.7 |
| Public Issues | 84.6 | 80.5 | 85.9 | 83.9 | 80.3 |

| Bond Quality (%) | 2005 | 2004 | 2003 | 2002 | 2001 |
|------|------|------|------|------|------|
| Class 1 | 72.1 | 70.0 | 68.5 | 65.9 | 59.1 |
| Class 2 | 20.3 | 22.9 | 23.2 | 23.8 | 30.2 |
| Class 3 | 4.4 | 4.4 | 4.8 | 6.4 | 6.6 |
| Class 4 | 2.9 | 2.4 | 2.9 | 3.0 | 3.3 |
| Class 5 | 0.2 | 0.3 | 0.4 | 0.6 | 0.6 |
| Class 6 | 0.0 | 0.1 | 0.2 | 0.3 | 0.2 |

| | 2005 | 2004 | 2003 | 2002 | 2001 |
|------|------|------|------|------|------|
| Mortgages (000) | 31,380,717 | 29,623,663 | 25,729,723 | 24,619,496 | 22,953,062 |
| Commercial | 80.2 | 81.1 | 80.0 | 79.6 | 77.5 |
| Residential | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Farm | 19.8 | 18.9 | 20.0 | 20.4 | 22.5 |

Copyright © 2006, A.M. Best Company. All Rights Reserved.
Reproduction and distribution of A.M. Best data to third parties is strictly
prohibited without express written consent. Visit the A.M. Best website at
http://www.ambest.com for the latest Best's Ratings and Best's Company Reports.

| Mortgage Quality (%) | 2005 | 2004 | 2003 | 2002 | 2001 |
|---|---|---|---|---|---|
| 90 Days Delinquent | 0.1 | 0.0 | 0.1 | 0.0 | 0.1 |
| In Process of Foreclosure | 0.0 | 0.1 | 0.0 | 0.0 | 0.1 |
| Total Delinquencies | 0.1 | 0.1 | 0.1 | 0.1 | 0.2 |

| Real Estate (000) | 2005 | 2004 | 2003 | 2002 | 2001 |
|---|---|---|---|---|---|
|  | 3,665,994 | 3,315,114 | 3,245,193 | 3,999,616 | 5,078,624 |
| Property Occupied by Co | 7.5 | 6.5 | 7.0 | 6.6 | 8.2 |
| Property Held for Inc | 92.5 | 86.9 | 90.2 | 88.0 | 91.0 |
| Property Held for Sale | 0.0 | 6.6 | 2.8 | 5.4 | 0.8 |

| Stocks (000) | 2005 | 2004 | 2003 | 2002 | 2001 |
|---|---|---|---|---|---|
|  | 4,197,344 | 4,428,176 | 4,906,275 | 5,115,538 | 7,553,619 |
| Unaffiliated Common | 39.9 | 31.0 | 15.7 | 16.9 | 32.5 |
| Affiliated Common | 10.5 | 13.9 | 31.4 | 54.3 | 45.9 |
| Unaffiliated Preferred | 5.6 | 8.7 | 14.2 | 15.4 | 11.5 |
| Affiliated Preferred | 43.9 | 46.3 | 38.7 | 13.4 | 10.0 |

| Other Inv Assets (000) | 2005 | 2004 | 2003 | 2002 | 2001 |
|---|---|---|---|---|---|
|  | 14,768,206 | 13,749,466 | 12,737,120 | 10,084,321 | 11,336,928 |
| Cash | 7.2 | 10.3 | 11.1 | 1.4 | 19.0 |
| Short-Term | 3.5 | 6.3 | 15.0 | 17.2 | 14.6 |
| Schedule BA Assets | 45.6 | 40.1 | 26.3 | 27.2 | 19.6 |
| All Other | 43.8 | 43.4 | 47.6 | 54.2 | 46.8 |

# HISTORY

**Date Incorporated:** 03/24/1868            **Date Commenced:** 03/25/1868
**Domicile:** NY

The Group periodically re-stacks its organization to promote operating efficiencies, financial flexibility and improve dividend capacity through its entities. In October 2003, MetLife, Inc. completed another re-stacking transaction to increase capital efficiency and flexibility between the parent MetLife, Inc., and its subsidiaries. This restacking plan resulted in the following intercompany transactions: MLIC sold Metropolitan Property and Casualty Insurance Company, Metropolitan Tower Life Insurance Company and two non-insurance subsidiaries to MetLife, Inc., the parent holding company. In addition, Security Equity Life Insurance Company and MetLife Security Insurance Company of LA were merged into the parent MetLife, Inc.. In 2002, MetLife, Inc.'s restacking plan resulted in the following intercompany transactions; MetLife, Inc. contributed MetLife Iberia, its Spanish subsidiary, to MetLife International Holdings, Inc. (MIH); MetLife, Inc. acquired Security Equity Life Insurance Company (Security Equity) and Cova Corporation (Cova) from General American Life Insurance Company (GenAm); MLIC contributed its subsidiary, to Cova; and MetLife sold MIH, Cova, MetLife Investors Group, Inc. and various foreign subsidiaries to MetLife, Inc., the parent holding company. GenAm also sold Missouri Reinsurance (Barbados), Inc. to MetLife and Walnut Street Securities to MetLife, Inc. In that same year, MetLife Group, Inc., a new subsidiary of MetLife, Inc., was created as an employee services company that supports all of the enterprise's personnel needs.

**Mergers:** Paragon Life Insurance Company, Missouri, 2006.

# OFFICERS

Chairman of the Board and Chief Executive Officer, C. Robert Henrikson; Presidents, Leland C. Launer, Jr. (Institutional), William J. Toppeta (International), Lisa M. Weber (Individual Business and Auto & Home); Senior Executive Vice President and Chief Administrative Officer, Catherine A. Rein; Executive Vice President and Chief Financial Officer, William J. Wheeler; Executive Vice President and Chief Investment Officer, Steven A. Kandarian; Executive Vice President and General

Copyright © 2006, A.M. Best Company. All Rights Reserved.
Reproduction and distribution of A.M. Best data to third parties is strictly
prohibited without express written consent. Visit the A.M. Best website at
http://www.ambest.com for the latest Best's Ratings and Best's Company Reports.

Best's Insurance Reports - Life Health, US, 2006 Edition (2005 Annual Data, Version 2006.1)
06704 - Metropolitan Life Insurance Company

Page 14

Counsel, James L. Lipscomb; Executive Vice President, Joseph J. Prochaska, Jr.; Senior Vice President and Secretary, Gwenn L. Carr; Senior Vice President and Treasurer, Anthony J. Williamson; Vice President and Actuary, Patrick D. Studley.

## DIRECTORS

Curtis H. Barnette, Burton A. Dole, Jr., Cheryl W. Grise, C. Robert Henrikson, James R. Houghton, Harry P. Kamen, Helene L. Kaplan, John M. Keane, James M. Kilts, Charles M. Leighton, Sylvia M. Mathews, Hugh B. Price, Kenton J. Sicchitano, William C. Steere, Jr.

## REINSURANCE

The company reinsures up to 90% of the mortality risk of certain blocks of life insurance. For more recent individual life blocks, the company reinsures certain corridors of mortality risk in excess of $1 million per life. The company's maximum net retention on any one life is $25,000,000. In addition to reinsuring mortality risk, the company reinsures other risks and specific coverages.

The company cedes reinsurance to a diversified array of affiliated and nonaffiliated reinsurers. Placement of reinsurance is done primarily on an automatic basis and also on a facultative basis for risks of specific characteristics. Reinsurance is primarily on a coinsurance, yearly renewable term, and modified coinsurance basis. The company also assumes a significant amount of insurance from affiliates as well as a few blocks from non-affiliates.

## REGULATORY

An examination of the financial condition is being made as of December 31, 2003 by the Insurance Department of New York. The 2005 annual independent audit of the company was conducted by Deloitte & Touche, LLP. The annual statement of actuarial opinion is provided by Patrick D. Studley, Vice President and Senior Actuary.

**Territory:** The company is licensed in the District of Columbia, Puerto Rico, U.S. Virgin Islands and all states. It is also licensed in all Canadian provinces and territories. It is also permitted to solicit life insurance among certain military personnel and their dependents and certain other United States and Canadian citizens overseas.

**Reserve basis:** (Current ordinary business): 1980 CSO 3% to 5.0% for policies which are valued on either the Net Level Premium Plan, CRVM or GCV valuation. (Current group annuity business): GAR94 and 1983 GAM 4.75% to 6.25%; CARVM. (Current individual annuity business): Annuity 2000 and 1983 Table a 4.75% to 6.25%; CARVM.

## FINANCIAL INFORMATION

### BALANCE SHEET - December 31, 2005
### (in thousands of dollars)

Copyright © 2006, A.M. Best Company. All Rights Reserved.
Reproduction and distribution of A.M. Best data to third parties is strictly
prohibited without express written consent.  Visit the A.M. Best website at
http://www.ambest.com for the latest Best's Ratings and Best's Company Reports.

Best's Insurance Reports - Life Health, US, 2006 Edition (2005 Annual Data, Version 2006.1)
08704 - Metropolitan Life Insurance Company

Page 15

| Assets | | Liabilities | |
|---|---|---|---|
| *Total bonds | 124,181,675 | +Net policy reserves | 114,068,270 |
| *Total preferred stocks | 2,081,168 | Policy claims | 2,200,482 |
| *Total common stocks | 2,116,176 | Deposit type contracts | 28,093,922 |
| Mortgage loans | 31,380,717 | Interest maint reserve | 560,151 |
| Real estate | 3,665,994 | Comm taxes expenses | 1,485,089 |
| Contract loans | 5,440,030 | Asset val reserve | 2,809,134 |
| Cash & short-term inv | 1,571,843 | Contingency reserve | 1,240,002 |
| Other invested assets | 6,727,061 | Other liabilities | 27,225,918 |
| Prems and consids due | 1,487,983 | | |
| Accrued invest income | 1,715,911 | Tot liab w/o sep accts | 177,682,968 |
| Other assets | 5,923,359 | Separate account bus | 64,033,411 |
| | | Total Liabilities | 241,716,379 |
| Tot assets w/o sep accts | 186,291,918 | Common stock | 4,945 |
| Separate account bus | 64,063,764 | Surplus notes | 1,397,830 |
| | | Paid in & contrib surpl | 5,373,823 |
| | | Special surplus funds | 363,660 |
| | | Unassigned surplus | 1,499,044 |
| Assets | 250,355,681 | Total | 250,355,681 |

*Securities are reported on the bases prescribed by the National Association of Insurance Commissioners. + Analysis of reserves; Life $51,137,987; annuities $54,271,629; supplementary contracts with life contingencies $1,288,629; accidental death benefits $62,314; disability active lives $276,836; disability disabled lives $307,977; miscellaneous reserves $591,066; accident & health $6,131,831.

## SUMMARY OF OPERATIONS
### (in thousands of dollars)

| Premiums: | | Death benefits | 5,926,342 |
|---|---|---|---|
| Ordinary life | 4,117,055 | Matured endowments | 16,993 |
| Individual annuities | 3,478,638 | Annuity benefits | 3,587,698 |
| Group life | 6,435,377 | Disability benefits | 27,384 |
| Group annuities | 9,916,689 | Surrender benefits | 11,030,155 |
| Acc & health group | 3,594,755 | Group conversion | 3,286 |
| Acc & health other | 474,933 | Acc & health benefits | 2,528,876 |
| Industrial | 52,129 | Int on policy funds | 922,202 |
| Misc premiums | -1,734,272 | Supplementary contracts | 177,720 |
| Total premiums | 26,335,305 | Incr life reserves | 3,020,220 |
| Supplementary contracts | 124,567 | Incr a & h reserves | 646,333 |
| Net investment income | 9,878,570 | Change in reserves | 33,223 |
| Amort interest maint res | 11,477 | Commissions | 656,156 |
| Net gain from sep acct | 6,844 | Comm exp reins assumed | 41,385 |
| Comm & exp reins ceded | 426,636 | Insur taxes lic & fees | 351,102 |
| Res adj on reins ceded | -2,430,056 | General ins expenses | 2,603,710 |
| Other income | 729,513 | Net transf to sep acct | 1,368,037 |
| | | Misc operating expense | 12,165 |
| | | Other disbursements | 5 |
| Total | 35,082,857 | Total | 32,952,991 |

Copyright © 2006, A.M. Best Company. All Rights Reserved.
Reproduction and distribution of A.M. Best data to third parties is strictly
prohibited without express written consent. Visit the A.M. Best website at
http://www.ambest.com for the latest Best's Ratings and Best's Company Reports.

Best's Insurance Reports - Life Health, US, 2006 Edition (2005 Annual Data, Version 2006.1)    Page 16
06704 - Metropolitan Life Insurance Company

| | |
|---|---:|
| Gain from operations before FIT & div to policyholders | 2,129,865 |
| Dividends to policyholders: life | 180,369 |
| Dividends to policyholders: accident & health | -383 |
| Gains from operations after dividends to policyholders | 1,949,879 |
| Federal income taxes incurred | 608,284 |
| Net gain from operations after FIT and dividends | 1,341,594 |

## CASH FLOW ANALYSIS
### (in thousands of dollars)

| Funds Provided | | Funds Applied | |
|---|---:|---|---:|
| Gross cash from oper | 36,446,297 | Benefits paid | 25,868,118 |
| Long-term bond proceeds | 103,301,182 | Comm, taxes, expenses | 3,656,391 |
| Other invest proceeds | 12,843,767 | Long-term bonds acquired | 102,832,255 |
| Other cash provided | 3,977,397 | Other cash applied | 24,917,305 |
| Decr cash & short-term | 705,427 | | |
| Total | 157,274,069 | Total | 157,274,069 |

## INTERIM BALANCE SHEET
### (in thousands of dollars)

| Assets | 03/31/2006 | | |
|---|---:|---|---|
| Total bonds | 137,906,604 | ... | ... |
| Total preferred stocks | 2,152,072 | ... | ... |
| Total common stocks | 2,307,769 | ... | ... |
| Mortgage loans | 31,630,224 | ... | ... |
| Real estate | 3,681,899 | ... | ... |
| Contract loans | 5,422,716 | ... | ... |
| Cash & short-term inv | 1,722,846 | ... | ... |
| Other invested assets | 6,880,184 | ... | ... |
| Accrued invest income | 1,928,366 | ... | ... |
| Other assets | 7,628,050 | ... | ... |
| Tot assets w/o sep accts | 201,260,730 | | |
| Separate account bus | 66,193,880 | ... | ... |
| Assets | 267,454,611 | | |

| Liabilities | 03/31/2006 | | |
|---|---:|---|---|
| Net policy reserves | 114,361,104 | ... | ... |
| Liab for deposit-type contracts | 30,089,132 | ... | ... |
| Policy claims | 2,387,749 | ... | ... |
| Interest maint reserve | 442,361 | ... | ... |
| Comm taxes expenses | 1,348,999 | ... | ... |
| Asset val reserve | 2,568,830 | ... | ... |
| Contingency reserve | 1,037,521 | ... | ... |
| Other liabilities | 39,715,152 | ... | ... |
| Tot liab w/o sep funds | 191,950,847 | | |

Copyright © 2006, A.M. Best Company. All Rights Reserved.
Reproduction and distribution of A.M. Best data to third parties is strictly
prohibited without express written consent. Visit the A.M. Best website at
http://www.ambest.com for the latest Best's Ratings and Best's Company Reports.

Best's Insurance Reports - Life Health, US, 2006 Edition (2005 Annual Data, Version 2006.1)
06704 - Metropolitan Life Insurance Company                                                    Page 17

| | | | |
|---|---|---|---|
| Separate account bus | 66,161,092 | ... | ... |
| Total liabilities | | | |
| | 258,111,940 | | |
| Common stock | 4,945 | ... | ... |
| Surplus notes | 1,397,830 | ... | ... |
| Paid in & contrib surpl | 5,373,823 | ... | ... |
| Special surplus funds | 348,373 | ... | ... |
| Unassigned surplus | 2,217,701 | ... | ... |
| Total | | | |
| | 267,454,611 | | |

## INTERIM SUMMARY OF OPERATIONS

| | Period Ended 3/31/2006 | Period Ended 3/31/2005 | Increase/ (Decrease) |
|---|---|---|---|
| Prems & ann consid | 6,957,692 | 6,444,285 | 513,407 |
| Total premiums | | | |
| | 6,957,692 | 6,444,285 | 513,407 |
| Supplementary contracts | 31,521 | 32,530 | -1,010 |
| Net investment income | 2,474,908 | 2,375,833 | 99,076 |
| Amort interest main res | -3,661 | 5,193 | -8,855 |
| Net gain from sep acct | 13 | 5,748 | -5,734 |
| Comm & exp reins ceded | 90,253 | 102,163 | -11,910 |
| Res adj on reins ceded | -602,215 | -509,396 | -92,820 |
| Other income | 184,200 | 141,928 | 42,272 |
| Total | | | |
| | 9,132,710 | 8,598,284 | 534,427 |
| Death benefits | 1,716,863 | 1,497,235 | 219,629 |
| Matured endowments | 4,663 | 4,270 | 393 |
| Annuity benefits | 919,114 | 895,823 | 23,292 |
| Surrender benefits | 3,031,420 | 2,778,630 | 252,791 |
| Disability and A&H ben | 699,778 | 637,337 | 62,441 |
| Group conversions | -64 | 459 | -523 |
| Int on policy funds | 312,118 | 186,565 | 125,553 |
| Supplementary contracts | 44,932 | 43,668 | 1,264 |
| Change in reserves | 620,723 | 1,271,766 | -651,043 |
| Commissions | 162,336 | 151,198 | 11,138 |
| Comm exp reins assumed | 6,923 | 12,854 | -5,931 |
| Insur taxes lic & fees | 106,956 | 87,520 | 19,436 |
| General ins expenses | 608,435 | 568,609 | 39,826 |
| Net transf to sep acct | 476,038 | -143,437 | 619,475 |
| Other disbursements | -9,440 | 1,847 | -11,287 |
| Total | | | |
| | 8,700,796 | 7,994,343 | 706,453 |
| Gain from operations before FIT & div to policyholders | 431,914 | 603,941 | -172,027 |
| Dividends to policyholders | 1,630 | 52,295 | -50,665 |

Copyright © 2006, A.M. Best Company. All Rights Reserved.
Reproduction and distribution of A.M. Best data to third parties is strictly
prohibited without express written consent. Visit the A.M. Best website at
http://www.ambest.com for the latest Best's Ratings and Best's Company Reports.

Best's Insurance Reports - Life Health, US, 2006 Edition (2005 Annual Data, Version 2006.1)
06704 - Metropolitan Life Insurance Company

| | | | |
|---|---|---|---|
| Gain from operations after dividends to policyholders | 430,284 | 551,646 | -121,362 |
| Federal income taxes incurred | -19,234 | -18,757 | -477 |
| Net gain from operations after FIT and dividends | 449,518 | 570,403 | -120,885 |

## SEPARATE ACCOUNT DATA

| | 2005 | 2004 | 2003 | 2002 | 2001 |
|---|---|---|---|---|---|
| Sep Acct Assets | 64,063,764 | 59,874,394 | 53,914,032 | 46,311,329 | 49,740,095 |
| % Growth | 7.0 | 11.1 | 16.4 | -6.9 | -11.0 |
| S/A Assets/Adm Assets | 25.6 | 24.5 | 23.5 | 23.0 | 26.8 |
| | | | | | |
| Sep Acct Reserves | 58,867,740 | 54,759,753 | 49,865,538 | 42,959,124 | 46,926,568 |
| % Ordinary Life | 5.5 | 5.3 | 5.1 | 4.4 | 4.3 |
| % Individual Annuities | 22.0 | 20.6 | 19.0 | 16.8 | 20.0 |
| % Group Annuities | 59.7 | 61.3 | 62.9 | 65.9 | 64.5 |
| % Group Life | 12.7 | 12.7 | 13.0 | 13.0 | 11.2 |
| Deposit Type Liabilities | 13,671 | 13,011 | ... | ... | ... |
| Other Liabilities | 5,152,000 | 5,053,474 | 3,932,643 | 3,245,716 | 2,626,533 |
| Sep Acct Surplus | 30,352 | 48,156 | 115,852 | 106,489 | 186,994 |
| | | | | | |
| S/A Prems & Deposits | 9,223,756 | 6,970,044 | 6,578,885 | 10,360,398 | -3,276,101 |
| % Ordinary Life | 5.8 | 8.0 | 7.7 | 5.2 | -16.0 |
| % Individual Annuities | 15.8 | 19.0 | 11.8 | 35.2 | 2.7 |
| % Group Annuities | 65.0 | 60.7 | 64.6 | 48.2 | 157.9 |
| % Group Life | 9.7 | 7.6 | 11.4 | 9.7 | -41.5 |
| % Other | 3.6 | 4.8 | 4.4 | 1.6 | -3.1 |
| | | | | | |
| Sep Acct Fees & Charges | 466,701 | 420,129 | 329,878 | 332,833 | 122,292 |
| % Ordinary Life | 12.5 | 13.2 | 15.9 | 16.9 | 86.2 |
| % Individual Annuities | 35.0 | 32.3 | 31.4 | 32.0 | 96.1 |
| % Group Annuities | 30.8 | 32.4 | 36.5 | 38.0 | -79.9 |
| % Group Life | 7.1 | 7.6 | 8.1 | 5.9 | -18.0 |
| % Other | 14.5 | 14.4 | 8.0 | 7.2 | 15.7 |
| Fees & Chgs to Assets | 0.8 | 0.7 | 0.7 | 0.7 | 0.2 |
| | | | | | |
| Sep Acct Ben & Wdrwls | 8,267,575 | 6,242,232 | 6,174,068 | 885,926 | 617,289 |
| % Ordinary Life | 1.6 | 3.0 | 1.3 | 7.1 | 28.1 |
| % Individual Annuities | 13.8 | 15.6 | 12.4 | 25.4 | 38.1 |
| % Group Annuities | 76.5 | 72.5 | 75.8 | 54.6 | -22.5 |
| % Group Life | 7.1 | 7.3 | 8.9 | 12.9 | 56.3 |
| % Other | 1.0 | 1.5 | 1.5 | ... | ... |
| Ben & Wdrwl to Assets | 13.3 | 11.0 | 12.3 | 1.8 | 1.2 |

## ORDINARY LIFE STATISTICS

Copyright © 2006, A.M. Best Company. All Rights Reserved.
Reproduction and distribution of A.M. Best data to third parties is strictly
prohibited without express written consent. Visit the A.M. Best website at
http://www.ambest.com for the latest Best's Ratings and Best's Company Reports.

Best's Insurance Reports - Life Health, US, 2006 Edition (2005 Annual Data, Version 2006.1)
06704 • Metropolitan Life Insurance Company

Page 19

| Year | Ord. Lapse Ratio % | Average Ord. Policy (in dollars) Issued | In Force | Avg. Prem ($/M) | 1st Yr Prem / Total Prem | 1st Yr Comm / 1st Yr Prem | Gen. Exp. / Policies In Force |
|------|------|------|------|------|------|------|------|
| 2001 | 6.5 | 202,385 | 47,983 | 12.50 | 8.8 | 27.0 | 98.39 |
| 2002 | 6.0 | 216,679 | 50,632 | 12.13 | 6.7 | 34.9 | 90.72 |
| 2003 | 6.0 | 242,943 | 53,309 | 11.73 | 6.2 | 28.0 | 102.03 |
| 2004 | 6.0 | 280,218 | 56,904 | 11.42 | 7.1 | 26.1 | 109.74 |
| 2005 | 5.2 | 293,962 | 62,147 | 10.80 | 8.1 | 28.5 | 108.87 |

| Year | # Policies Issued (000) | # Policies in Force (000) | First Year Premium (000) | Gen'l Exp/ Reserves (%) | Return on Reserves (%) |
|------|------|------|------|------|------|
| 2001 | 162 | 8,418 | 440,934 | 1.96 | 0.96 |
| 2002 | 149 | 8,111 | 331,704 | 1.69 | 0.54 |
| 2003 | 128 | 7,795 | 299,037 | 1.79 | 0.21 |
| 2004 | 131 | 7,403 | 341,436 | 1.81 | 0.29 |
| 2005 | 123 | 7,140 | 386,436 | 1.69 | -0.53 |

Note: Ordinary excludes monthly debit ordinary accounts.

## INDIVIDUAL ANNUITY STATISTICS

| Year | NPW & Dep (000) | Res & Dep Liab (000) | Exp to Res & Dep Liab (%)* | Comm & Exp to NPW & Dep (%) | Benefits & Wdrwls to NPW & Dep (%) | Benefits & Wdrwls to Res & Dep Liab (%)* |
|------|------|------|------|------|------|------|
| 2001 | 8,215,619 | 30,492,457 | 0.9 | 5.2 | 36.1 | 9.2 |
| 2002 | 10,085,493 | 31,309,701 | 0.8 | 5.3 | 28.7 | 8.7 |
| 2003 | 13,148,699 | 36,084,663 | 0.8 | 5.7 | 22.5 | 7.7 |
| 2004 | 13,588,393 | 40,029,155 | 0.9 | 6.3 | 26.2 | 8.5 |
| 2005 | 9,400,074 | 41,971,560 | 0.9 | 5.7 | 37.7 | 8.2 |

* Includes Separate Account reserves.

## GROUP ANNUITY STATISTICS

| Year | NPW & Dep (000) | Res & Dep Liab (000) | Exp to Res & Dep Liab (%)* | Comm & Exp to NPW & Dep (%) | Benefits & Wdrwls to NPW & Dep (%) | Benefits & Wdrwls to Res & Dep Liab (%)* |
|------|------|------|------|------|------|------|
| 2001 | 9,470,158 | 65,941,745 | 0.7 | 5.5 | 148.0 | 21.3 |
| 2002 | 10,238,334 | 65,464,275 | 0.4 | 2.6 | 97.9 | 15.3 |
| 2003 | 12,615,046 | 73,370,879 | 0.5 | 3.0 | 74.0 | 12.7 |
| 2004 | 12,896,591 | 80,567,107 | 0.3 | 2.6 | 74.2 | 11.9 |
| 2005 | 14,379,461 | 86,733,045 | 0.3 | 2.6 | 79.1 | 13.1 |

* Includes Separate Account reserves.

## TOTAL ANNUITY ACTUARIAL RESERVES AND DEPOSIT TYPE LIABILITIES BY WITHDRAWAL CHARACTERISTICS

Copyright © 2006, A.M. Best Company. All Rights Reserved.
Reproduction and distribution of A.M. Best data to third parties is strictly
prohibited without express written consent. Visit the A.M. Best website at
http://www.ambest.com for the latest Best's Ratings and Best's Company Reports.

Best's Insurance Reports - Life Health, US, 2006 Edition (2005 Annual Data, Version 2006.1)
06704 - Metropolitan Life Insurance Company

| Year | Total Annuity Res & Dep Liab (000) | Min or No Surrender Charge (%)* | With Surrender Charge 5% or more (%)* | With MVA (%)* | No Surrender Allowed (%)* |
|---|---|---|---|---|---|
| 2001 | 85,254,746 | 51.4 | 1.4 | 8.3 | 38.9 |
| 2002 | 99,619,130 | 48.3 | 1.4 | 8.3 | 42.0 |
| 2003 | 112,336,250 | 51.9 | 0.8 | 9.1 | 38.1 |
| 2004 | 123,403,968 | 43.4 | 2.3 | 9.8 | 44.5 |
| 2005 | 131,527,605 | 42.2 | 2.1 | 9.9 | 45.8 |

* Includes Separate Account reserves.

## NEW LIFE BUSINESS ISSUED
### (in thousands of dollars)

| Year | Whole Life & Endow | Term | Credit | Group | Indus-trial | Total Non-Insurance Issued | Par (%) | Par (%) |
|---|---|---|---|---|---|---|---|---|
| 2000 | 19,032,803 | 12,209,942 | ... | 115,646,839 | ... | 146,889,584 | 19 | 81 |
| 2001 | 17,165,090 | 15,560,572 | ... | 139,420,777 | ... | 172,146,439 | 16 | 84 |
| 2002 | 15,312,802 | 16,981,326 | ... | 142,969,002 | ... | 175,263,130 | 15 | 85 |
| 2003 | 12,122,610 | 18,947,316 | ... | 136,183,843 | ... | 167,253,769 | 16 | 84 |
| 2004 | 13,356,653 | 23,315,216 | ... | 136,369,952 | ... | 173,041,821 | 18 | 82 |
| 2005 | 13,463,782 | 22,568,902 | ... | 141,070,733 | ... | 177,103,417 | 18 | 82 |

## LIFE INSURANCE IN FORCE
### (in thousands of dollars)

| Year | Whole Life Endow & Adds | Term | Credit | Group | Industrial | Total Insurance In Force |
|---|---|---|---|---|---|---|
| 2000 | 279,764,391 | 117,937,604 | ... | 1,337,696,407 | 3,288,921 | 1,738,687,323 |
| 2001 | 283,629,306 | 120,297,916 | ... | 1,464,762,917 | 3,212,213 | 1,871,902,352 |
| 2002 | 284,882,998 | 125,767,976 | ... | 1,540,829,146 | 3,138,841 | 1,954,618,961 |
| 2003 | 279,228,427 | 136,344,577 | ... | 1,687,029,865 | 3,061,719 | 2,105,664,588 |
| 2004 | 274,944,039 | 146,310,216 | ... | 1,856,877,136 | 2,979,492 | 2,281,110,883 |
| 2005 | 280,637,544 | 163,075,117 | ... | 2,097,405,771 | 2,896,285 | 2,544,014,717 |

Copyright © 2006, A.M. Best Company.  All Rights Reserved.
Reproduction and distribution of A.M. Best data to third parties is strictly
prohibited without express written consent. Visit the A.M. Best website at
http://www.ambest.com for the latest Best's Ratings and Best's Company Reports.

# PROOF OF SERVICE

## STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is: Barger & Wolen LLP, 633 West Fifth Street, 47th Floor, Los Angeles, California 90071-2043.

On May 16, 2007 , I served the foregoing document(s) described as NOTICE OF REMOVAL PURSUANT TO 28 U.S.C. §§ 1441 AND 1446 on the interested parties in this action by placing [ ] the original [X] a true copy thereof enclosed in sealed envelope addressed as stated in the attached mailing list.

**Ray Bourhis, Esq.**                          **Counsel for Plaintiff**
**Bourhis & Mann**                             **EDWARD CONTRERAS**
**1050 Battery Street**
**San Francisco, California 94111**
**Telephone No.: (415) 392-4660**
**Facsimile No.: (415) 421-0259**

[X] **BY MAIL**

[X] I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with U.S. Postal Service on that same day with postage thereon fully prepaid at Los Angeles, California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postage cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

[ ] **BY PERSONAL SERVICE**

[ ] I caused such envelope to be delivered to a commercial messenger service with instructions to personally deliver same to the offices of the addressee on this date.

[ ] **BY FACSIMILE**

[ ] By transmitting an accurate copy via facsimile to the person and telephone number as follows: **Ray Bourhis, Esq. (Fax No. 415-421-0259)**

[X]    **(FEDERAL)**    I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made. Executed at Los Angeles, California on May 16, 2007.

MELANIE A. TAVERA
(Name)                                      (Signature)

BARGER & WOLEN LLP
633 W. FIFTH ST.
FORTY-SEVENTH FLOOR
LOS ANGELES, CA 90071
(213) 680-2800

i:\office7\7197\184\07pleadings\proof - federal.doc

75